# THE AMERICAN EXPRESS COMPANY

*v.*

## SOLOMON G. LESEM *et al.*

1. EXPRESS COMPANIES—*their liability under a "C O. D.," and herein of parol evidence in respect thereof.* When an express company gives a receipt for a package for transportation, in which the letters C. O. D. are used, and a certain sum is also stated in connection therewith, in a suit against the company by the consignor to recover the value of the package, which was delivered to the consignee without the amount being collected, parol evidence is admissible to prove the meaning of those letters.

2. And if an express company, or other common carrier, resort to enigmas in the conduct of their business they shall not, alone, be permitted to afford the solutions.

3. But it is not competent, in such case, for the company to prove by parol that goods which had on prior occasions been sent by the same consignor to the same consignee, and the receipt given therefor using the same letters, were delivered to the consignee without payment being first required, upon an understanding to that effect between him and the consignor, as such an arrangement in regard to prior transactions did not preclude the company from contracting not to deliver the goods until the money was paid, and such proof would change the legal import and effect of the written contract, which cannot be done by parol.

4. In this case, which was of the character mentioned, the agent of the company testified that the letters "C. O. D." meant that the company was to collect of the consignee, on delivery, the amount due from him, and marked on the package, and to return such amount to the consignor. "And this," the court say, "is the experience of the whole business community employing such an agency." "The letters are the initials, and so understood, of the words 'collect on delivery,' and this undertaking, by those letters, the company assumed, and they must be held to a strict performance thereof."

5. PLEADING—*necessity of averring the meaning of characters or letters.* In order to introduce parol proof in what sense, characters or letters which have not acquired a legal signification, are used in a particular trade or business, it is necessary, in a suit brought upon a contract embodied in such letters or characters, to aver in the declaration that they are so used.

6. AGENT OF AN EXPRESS COMPANY—*how far he may bind his principal.* An express company is bound by all the acts of its agents done in the regular course of its business.

7. So where the agent gives a receipt for goods for transportation, in which the letters "C. O. D." are used, the company is bound by the contract.

8. PAYMENT—*application of.* When an express company delivered goods to a consignee, which were required to be paid for before delivery, receiving only part payment, but remitted the portion so paid to the consignor, the consignor has no right to apply such payment on other indebtedness due him from the consignee, but must credit it to the company.

APPEAL from the Circuit Court of Adams county; the Hon. JOSEPH SIBLEY, Judge, presiding.

This case is fully stated in the opinion of the Court.

Mr. N. BUSHNELL, for the appellant.

Upon the principal question, the counsel made the following points:

This was an action of assumpsit brought in the court below, by Lesem & Brother, against the American Express Company, to recover the value of a box of goods delivered to the company by the plaintiffs, at Quincy, Illinois, as is alleged, to be from thence transported to Stewartsville, Mo.  The alleged ground of recovery is, that the company delivered the goods to the consignee without collecting from him the value thereof, as it is claimed they were bound to do under their contract embodied in the following receipt :

> "AMERICAN EXPRESS COMPANY,
> "December 26, 1863.

"Received of S. J. Lesem & Bro., 1 box, said to contain D. G. & cloths, valued at 356.34, marked W. C. T. Davidson & Co., Stewartsville, Mo., which we undertake to forward to the nearest point of destination reached by this company, subject expressly to the following conditions, namely : This company is not to be held liable for any loss or damage, except as forwarders only, nor for any loss or damage, by fire, by the dangers of navigation, by the act of God, or of the enemies of the government, the restraints of governments, mobs, riots, insurrections, pirates, or from or by reason of any of the hazards or dangers incident to a state of war, nor shall this company be liable for any default or negligence of any person, corporation or association, to whom the above described property shall or may be delivered by this company, for the performance of any act or duty in respect thereto, at any place or point off the established routes or lines run by this company, and any such person, or corporation or association, shall be deemed and taken to be the agent of the person, corporation or association, from whom this company received the property above described; nor shall this company be liable for any loss or damage of any box, package or thing, for over $50, unless the just and true value thereof is herein stated ; nor upon any property or thing unless properly packed and secured for transportation ; nor upon any fragile fabrics, unless so marked upon the package containing the same; nor upon any fabrics consisting of or

contained in glass.   The party accepting this receipt hereby agrees to the conditions herein stated.

" For the proprietors,        J. H. DURFEE, *Agent.*
" 356.34.   C. O. D."

The plaintiffs recovered a juagment, from which the company took this appeal.

On the trial below the agent of the company testified on behalf of the plaintiff, that the letters " C. O. D." meant that the company was to collect of the consignee on delivery, the amount due from him, and marked on the package, and to return such amount to the consignor.

I insist this evidence was not admissible.

The enigma C. O. D, is legally incapable of explanation by parol.   It constitutes a new Sphinx riddle, and there is no rule of law by which any modern Ædipus can be allowed to solve it.   There are certain customary abbreviations which the law takes notice of and which need no explanation.   They create no ambiguity, legal or actual.   There are also words and phrases which have a peculiar meaning under certain circumstances, or when applied to particular subjects, and these may be explained by parol proof; for the ambiguity is latent, and being created by evidence of extrinsic circumstances, may be removed by the same kind of evidence.   Words or phrases may also have a peculiar meaning in a contract, arising from its subject-matter, the situation of the parties and surrounding circumstances, and they may in like manner be explained by extrinsic proof of the facts which characterize this peculiar meaning.   But here, these letters form no abbreviation recognized by law.   They are not shown to have any technical meaning as applied to the subject-matter of this contract; or to have any known meaning in common use; or to relate to, or to be in use in any art, trade, calling or business; not even in the special business of the defendant express company; or that the defendant at any time, in any contract, before or since, or that any other person, at any time, in any contract with the defendant, before or since, ever used these letters as abbreviations, or to in any

manner express the terms of a contract, or for any other purpose. These letters stand, not in the body but at the foot of the contract, simply as three plain, unintelligible letters of the alphabet, in their juxtaposition unknown to the law or to any common or special usage;—constituting, if any thing, a plain, naked, patent ambiguity, incapable of explanation by the rules of law. If, however, they have any meaning in this contract, and were capable of explanation, the plaintiff should have brought himself within the rule which, in exceptional cases, permits words and phrases in a written contract to be explained by parol testimony. Nothing of this sort was done, or even attempted. Durfee's evidence to explain their meaning should not, therefore, except in connection with other appropriate evidence, have been received. And though received, as it seems to have been, without objection, yet in point of law it is no evidence and is entitled to no weight as evidence; both for the reason that the thing sought to be explained is unexplainable by parol, and that no amount of parol evidence can legally explain it; and because if it is legal and competent evidence, as far as it goes, and is to be weighed as such, it is legally insufficient to explain it; for the reason that it gives none of the extrinsic facts out of which and by which only can the explanation by any legal method arise or be made. 1 Bouv. Law Dict. 74—"Ambiguity"; *McAvoy* v. *Long,* 13 Ill. 147; *Broadwell* v. *Broadwell,* 1 Gilm. 600; *Weed* v. *Hobbs,* 2 Scam. 297; *Doyle* v. *Teas,* 4 Scam. 202, 253, 257; *Lane* v. *Sharp,* 3 Scam. 567; *Barrett* v. *Stow,* 15 Ill. 423; *Maxey* v. *Clabaugh,* 1 Gilm. 26; *Eaton* v. *Smith,* 20 Peck, 150; *Peisch* v. *Dickson,* 1 Mason C. C. 9; *Paston* v. *Taft,* 22 Ill. 366; *Hartwell* v. *Camman,* 2 Stork. Ch. 128; *Lett* v. *Horner,* 5 Black. 296; *The Richmond Trading Co.* v. *Farquar,* 8 Black. 89; *Hodges* v. *King,* 7 Met. 583, 586; *McCullough* v. *Wainright,* 14 Penn. 173; *Fish* v. *Hubbard,* 21 Wend. 651.

These cases show the application of the rules of law by which parol evidence, to explain the meaning of the parties to a written contract, is admitted or excluded in nearly every variety of case. Whenever admitted, it is only on proof extrinsic and

concurring circumstances which may serve to explain the doubt created by extrinsic proof. In this case the ambiguity is patent, and no parol proof should have been received; and, being received, it can have no weight as evidence, for the reason that the explanation of the contract sought to be made is not legally capable of explanation by parol; or if capable of such explanation, it can only be done by proof of any extrinsic facts which may serve to explain it. It is the extrinsic facts proved which must make the explanation, and not the mere naked opinion of a witness. Here no facts are proved. We have merely the opinion of Durfee. This is to make a witness usurp the province of the jury, whose province it is, in view of all the extrinsic circumstances proved, to find, under the directions of the court, what the parties meant by these letters; the meaning of which depends upon a mixed question of law and fact. *McCullough* v. *Wainright*, 14 Penn. 173; *Fowle* v. *Bigelow*, 10 Mass. 379, 383, 384.

Where words are abbreviated in a written instrument it may be shown by parol proof what word the abbreviation stands for, for the purpose of identifying the instrument, but not for the purpose of giving it a construction. Here it is sought to explain these letters, not only for the purpose of giving a construction to the instrument, but for the purpose of creating a contract. Almost the entire contract, three out of its four essential terms, as alleged in the declaration, and the very clause of it of which special violation is charged, are sought to be manufactured by this parol explanation. *Hite* v. *The State*, 9 Yerg. 357, 381; *Rives* v. *Marrs*, 25 Ill. 316, 317; *Speer* v. *Craig*, 22 Ill. 433.

But, in another point of view, treating Durfee's evidence on this point as competent and legally effective, so far as it goes, it still proves nothing in respect to the terms of this contract. He says these letters mean certain things. To *whom* do they mean those things? Do the express company understand them to mean that? Do S. J. Lesem & Brother understand them to mean that? Did *both* parties at the time this written instrument was signed, understand them to mean that? For if both

parties did not so understand them at that time they mean nothing in this contract. The witness neither says this, nor any of these things, nor any thing like them, or any of them. Suppose that instead of this C. O. D. there were placed at the foot of a contract some Hebrew characters or Sanscrit, or Egyptian hieroglyphics, and a witness is called who states that those characters or hieroglyphics mean certain things, that properly translated they will express those things; would not the question at once arise to *whom* untranslated, do they mean those things?—to the scholar who can translate them?— or to the plain farmer who made the contract, and who can perhaps with difficulty read plain English, much less Hebrew, or Sanscrit, or hieroglyphics? If a party was sought to be charged on such characters, should we not first of all desire to know what the parties used them for?—what meaning they attached to them?—whether the parties, both parties, agreed as to their meaning?—and whether they contracted with reference to that meaning as a part of their contract? And yet here stand these three capitals at the foot of this receipt, so placed that the jargon of no Tartar or Choctaw nation can be more unintelligible, while there is not a word or syllable in the evidence to show why, or for what purpose they are there; or when, or by whom, or by whose direction they were placed there; or whether they were there when the paper was signed; or, if so, whether the parties attached any and what meaning to them; or contracted with reference to that meaning as a part of their contract; or as to what that meaning was as understood by the parties, both parties, at the time. Durfee, the witness, testifying in the present tense more than fifteen months after this receipt was given, says those letters "mean" so and so. I ask to *whom* do they mean this?—when did they get this meaning? Between what parties did they get it? Did they get it between *these* parties? In what art, trade, or business, or in respect to what subject-matter do they mean this? What do they mean on *that paper?* If they were there when the instrument was made, what do they mean on *it?*—and what meaning did the parties, each and both of them, attach

to those letters, at the time, as they stand there in all their naked nothingness? When sought to be charged on such a pretense as this, a party has the right—the law gives him the right—the court will protect him in the right—to require the strictest and the most unmistakable proof of every item which goes to make up the charge. They require and will require no common certainty, but certainty to every intent. A cross, a circle, or a straight line, even, placed on the margin, or at the foot of a paper, can just as readily be converted into a *written* contract by parol proof, as can these three capitals into the contract alleged in the first count. If, indeed, a *written* contract can be made by *parol*, this seems to be the best specimen soon likely to occur in which to try the experiment; and if this attempt shall succeed on this evidence, Gallileo, it would seem to me, could have desired no better evidence that the world does move.

See authorities already referred to under this head.

We respectfully insist, therefore, that giving to Durfee's testimony all the weight to which it can be entitled, there is no evidence to prove the contract alleged in the first count, that the defendants were to collect of W. C. T. Davidson & Co. $356.34, or any other sum, on the delivery of the goods; and that the verdict should therefore have been in favor of the defendants on that count.

If this is so as to the first count, then much more is there no evidence to prove the special contract alleged in the second and third counts, and the reason is still stronger why the verdict on those counts should have been for the defendants.

But this evidence having been received, the company offered to prove that goods which had on prior occasions, been sent by the same consignors to the same consignees, and the packages marked in the same manner, were delivered to the consignees without payment being first required, upon an understanding to that effect between them and the consignors; the court refused to permit this proof, and in this ruling I contend the court erred. The object of this proof was to show the extrinsic facts connected with the making of this contract and the use of

these letters by the parties in this business, in order to there-from arrive at the true sense in which they were used in a contract, thus executed in the regular course of trade.

If it is assumed that these letters do not create a patent ambiguity, which exclude all parol explanation, then nothing seems clearer on the authorities than that this evidence should have been received. If no parol evidence can be received to explain them, then the verdict should have been for the defendants.

The evidence of custom or usage, local or special, relating to any trade, business or subject-matter, the special customs or usages of individuals in their respective trades or business, the cotemporaneous construction given by the parties to a contract, and their course of dealing connected with and under it, are always admissible in evidence to explain the meaning of doubtful words or expressions in a contract relating to such trade, business or subject-matter, and to show in what sense such doubtful words or expressions were used in such contract. This is not done in order by such evidence to modify or vary the terms of a written contract; it is never considered as evidence of that character; but it is allowed in order to show what the contract really was, to show by the aid of these extrinsic facts in what sense the parties used these doubtful words or expressions. No head of the law seems better grounded in the authorities than this; and surely no contract can well be imagined which can with more grace invoke the aid of such evidence than the one presented by this record. 2 Stark. Ev. 258, 259; 1 Greenl. Ev. §§ 292, 293, 295; *Renner* v. *The Bank of Columbia*, 5 U. S. Cond. 691, 695; *Bodfish* v. *Fox*, 23 Maine, 90, 94, 96; *Rankin* v. *The American Insurance Co.*, 1 Hall, 619, 632, 694, 697; *Astor* v. *The Union Insurance Co.*, 7 Cow. 202, 214, 216; *Gordon* v. *Little*, 8 Serg. & Rawle, 533, 538; *Eaton* v. *Smith*, 20 Pick. 150, 156; *Dixon* v. *Dunham*, 14 Ill. 324; *Avery* v. *Stewart*, 2 Conn. 69, 70, 71, 73, 74; *Inglebright* v. *Hammond*, 19 Ohio, 337, 344; The Reeside, 2 Sumn. 567, 569, 570; *Sampson* v. *Gazzam*, 6 Port. (Ala.) 123, 132, 133; *McClure* v. *Cox*, 32 Ala. 617, 621, 622; *Allegre*

v. *The Maryland Insurance Co.*, 2 Gill & Johns. 136, 163, 164; *Noble* v. *Kennoway*, 2 Doug. 510, 512 ; *Goodwin* v. *Ogden*, 4 Hill, 104; *Gleason* v. *Walsh*, 43 Maine, 397 ; *Barlow* v. *Lambert*, 28 Ala. 704, 709, 710 ; *Stroud* v. *Frith*, 11 Barb. S. C. 300.

As to the special usages and customs of persons in their own particular trades or business: *Stroud* v. *Frith*, 11 Barb. S. C. 300; *Loring* v. *Gurney*, 5 Pick. 15 ; *Naylor* v. *Semmes*, 4 Gill & Johns. 273, 276; *Morgan* v. *Richards*, 1 Brown (Penn.) 171, 173; *Stone* v. *Bradbury*, 14 Maine, 185 ; *Bancroft* v. *Peters*, 4 Mich. 619, 625, 626; *Union Bank* v. *Hyde*, 4 U. S. Cond. 189, 191.

Aside from the application of the rules of evidence relating to mere custom and usage, but on analogous principles, this evidence should have been received to show, as it would have shown in connection with the other evidence, the circumstances under which the contract was made, the relation of the parties to it, to its subject-matter, and to each other the making of similar contracts by the parties attended by similar marks and letters in the same business, in respect to the same subject-matters, and under similar relations to each other, and to the general running arrangement then existing by which such goods were to be delivered, and were by the concurrence of all the parties, delivered without payment. Such evidence would have furnished the best possible means of explaining, by the repeated and concurring acts of the parties, what was the real meaning in respect to what appears to be uncertain on the face of the contract. And further, this shipment was not an entire or isolated transaction. It was only one of a series of acts done subsequent to the making of and under a general arrangement which extended from July or August, 1863, to February, 1864, covering a period before, at the time of, and after the making of this receipt, as the excluded evidence, in connection with the other proof, would have shown. Not only the facts connected with this particular package and receipt, but whatever the parties did under that general arrangement in part execution of which this receipt was given, becomes material and pertinent evidence to explain the uncertainty apparent on its face.

When, under these circumstances, we fully understand what practical construction the parties have given to that general arrangement in the particulars supposed to be embraced in the uncertain tenor of this paper, we have arrived at the best test which the nature of the case admits of for the solution of what they meant by it. Evidence of this character is always admissible to explain the doubtful meaning of words and phrases in written instruments, in cases where parol evidence will be received at all. 1 Greenl. Ev. §§ 292, 293, 295 ; *Knight* v. *The New England Worsted Co.*, 2 Cush. 271, 283, 284; *Grant* v. *Lathrop*, 3 Fost. (N. H.) 67, 81; *Gray* v. *Story*, 1 Story, 574, 588; *Childress* v. *Ford*, 10 Smedes & Marsh. 25, 30; *Webster* v. *Endfield*, 5 Gilm. 298, 301, 302; *Beacham* v. *Eckford*, 2 Sandf. Ch. 116, 119, 120; *Union Bank* v. *Hyde*, 4 U. S. Cond. 189, 191.

It was a good defense for the defendants to show that they delivered the goods to Davidson with the consent or by the authority of the plaintiffs, and the court so instructed the jury. The evidence offered and excluded was pertinent and proper, in connection with the other evidence in the case, to show the plaintiffs' consent, and it was, in this point of view, error to exclude it.

Messrs. SKINNER & MARSH, for the appellees, contended that the " C. O. D." being an abbreviation of " collect on delivery the amount annexed," implies return and payment of the money to consignors. These abbreviations are the invention of appellant for their own convenience in dispatch in making the contract, and to guide their employees, and must be most strongly interpreted against them. It is *their* contract, in *their chosen words* and *figures*, forced on the appellees.

There is not a business man in the whole country who does not know the import of these abbreviations, and so public is their use, and so general is the comprehension of them, that a court may take judicial notice of their use and adoption. And without judicial recognition of their use, or competency of proof to explain them, the public are in the power of these companies

to an extent amounting to business *vassalage*. But their use and meaning in the contract are proven. The admitted agent of the company at Quincy, who executed the contract, testifies that these letters mean " that the company is to collect on delivery the amount due from the consignee, marked on the package, and return that amount to the consignor."

Counsel insisted the ruling of the court below in excluding proof of a former usage or arrangement was correct, among other reasons, because no such former usage or arrangement could in any way bar or preclude the appellees from afterward making a *special contract* with appellant or any one else, contrary thereto, nor could it in any way affect or modify the *written contract* between the parties to this record.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was an action of assumpsit in the Circuit Court of Adams county, brought by Solomon J. Lesem & Brother, a mercantile firm trading and doing business under that name, against the American Express Company; and such proceedings were had, that a verdict was rendered for the plaintiffs for the sum of three hundred and fifty-six dollars and thirty-four cents. A motion for a new trial was overruled and judgment entered on the verdict, from which the defendants appeal to this court.

The errors assigned are the following: In refusing to permit the defendants to read in evidence the fourth, fifth, sixth, seventh and ninth interrogatories, and the several answers thereto of the witness Summers.

In giving to the jury the instructions numbered one, two, three, six, seven, eight and nine on the part of the plaintiffs.

In overruling the motion for a new trial, on the ground that the verdict was against the weight of evidence, and because the damages were excessive.

In refusing instructions asked by the defendants, and in rendering judgment on the verdict.

To understand the force of this assignment of errors, a brief statement of the prominent facts is necessary.

On the 26th of December, 1863, the plaintiffs, Lesem & Brother, were merchants trading and doing business in the city of Quincy. A mercantile firm had, before that time, been trading and doing business at Stewartsville, Missouri, under the name of W. C. T. Davidson & Co., composed of W. C. T. Davidson and John A. E. Summers. Summers, in October, 1863, retired from the concern, having been a member about four months, and Davidson continued the business under the old firm name. During the existence of the firm, goods had been sent to it by plaintiffs by rail, at various times, and conveyed by the defendants. The packages containing the goods were marked C. O. D.

On the 26th of December, 1863, a box of goods of the value of three hundred and fifty-six dollars and thirty-four cents was put in charge of the defendants by the plaintiffs, at Quincy, addressed to W. C. T. Davidson & Co., Stewartsville, Missouri, for which this receipt was given to plaintiff:

"AMERICAN EXPRESS COMPANY, }
December 26th, 1863. }

"Received of S. J. Lesem & Bro., 1 box said to contain D. G. and cloths, valued at 356.34, marked W. C. T. Davidson & Co., Stewartsville, Mo., which we undertake to forward to the nearest point of destination reached by this company, subject expressly to the following conditions, namely : This company is not to be held liable for any loss or damage, except as forwarders only, nor for any loss or damage, by fire, by the dangers of navigation, by the act of God, or of the enemies of the government, the restraints of governments, mobs, riots, insurrections, pirates, or from or by reason of any of the hazards or dangers incident to a state of war, nor shall this company be liable for any default or negligence of any person, corporation or association, to whom the above described property shall or may be delivered by this company, for the performance of any act or duty in respect thereto, at any place or point off the established routes or lines run by this company, and any such person or corporation or association shall be deemed and taken to be the agent of the person, corporation or association, from whom this company

received the property above described; nor shall this com-: pany be liable for any loss or damage of any box, package or thing for over $50, unless the just and true value thereof is herein stated; nor upon any property or thing, unless properly packed and secured for transportation; nor upon any fragile fabrics, unless so marked upon the package containing the same; nor upon any fabrics consisting of or contained in glass. The party accepting this receipt hereby agrees to the conditions herein contained.

"For the proprietors,    J. H. DURFEE, *Agent.*
"356.34.   C. O. D."

It appears, Summers, while such partner in the firm of W. C. T. Davidson & Co., was also agent of the defendants at Stewartsville, and so remained until 23d of December, 1863. He was on that day succeeded by Orlando G. McDonald.

The box of goods not being accounted for by the defendants, this action was brought against them for the value of its contents.

The declaration contains four counts. The first count alleges that on the 26th day of December, 1863, the defendant was a common carrier of goods, between Quincy, Ill., and Stewartsville, Mo., that on that day the plaintiffs delivered to the defendant, at Quincy, Ill., one box of goods worth $356.34, to be safely carried by the defendant to said Stewartsville, and then to be delivered by the defendant, for the plaintiffs, to W. C. T. Davidson & Co., upon their paying to the defendant for the plaintiffs, the value of said box of goods, viz.: $356.34; the said sum of $356.34 to be returned, and paid by the defendant to plaintiffs at Quincy; and the said goods not to be delivered to said W. C. T. Davidson & Co. without payment of the said sum of $356.34; that, in consideration thereof, and of a certain reward, the defendant promised the plaintiffs safely to carry said goods from Quincy to Stewartsville, and there safely to deliver the same to W. C. T. Davidson & Co. upon their paying to the defendant, for the plaintiffs, the said sum of $356.34, and not to deliver the same to said W. C. T. Davidson & Co. without payment, and to return and pay over to the plaintiffs the said

sum of $356.34: yet the said defendant, though a reasonable time has elapsed, and although specially requested so to do, has not returned or paid over to the plaintiffs the said sum of $356.34, nor any part thereof, whereby the value of the goods has been wholly lost to the plaintiffs.

The second count alleges that on the 26th day of December, 1863, the defendant was a common carrier of goods and collector of moneys; that the plaintiffs before that had bargained and sold to W. C. T. Davidson & Co., a mercantile firm doing business at Stewartsville, certain goods of the value of $356.34, to be transported by the plaintiffs from said Quincy, through the defendant, as such common carrier, to said Stewartsville, and there to be delivered by the defendant to the said W. C. T. Davidson & Co., only upon payment by them of the said sum of money to the defendant, to be by the defendant thence carried to said Quincy, and then delivered and paid over to the plaintiffs, and upon the readiness of the defendant, at said Stewartsville, the goods so to deliver, in case of the non-payment of the price aforesaid, the same goods to be returned by the defendant to the plaintiffs at said Quincy; that the plaintiffs on the day and year aforesaid delivered the said goods, to wit: one box of dry goods of the value of $356.34, to the defendant at Quincy, to be carried to Stewartsville, and there delivered to W. C. T. Davidson & Co., on payment of the price, and in case of non-payment, the goods to be returned to the plaintiffs at Quincy; that the defendant received the goods, and in consideration of the premises, promised to carry them safely to Stewartsville, and to deliver them to W. C. T. Davidson & Co., only upon payment of the price, and to collect and deliver to the plaintiffs, at Quincy, the price thereof; and in case W. C. T. Davidson & Co. failed to pay for the goods, when ready to be delivered, then safely to return and redeliver the goods to the plaintiffs at Quincy; that although reasonable time for that purpose has elapsed, the defendant has not paid over the price of the goods, nor returned the goods to the plaintiffs, though specially requested so to do, whereby the goods and the price thereof have been wholly lost to the plaintiffs.

The third count alleges that the defendant was a common carrier and collector, etc.; that on that day the plaintiffs delivered to the defendant one box of goods of the value of $356.34, to be carried from Quincy to Stewartsville, and there to be delivered to W. C. T. Davidson & Co. only upon payment of the price, and the money to be returned by the defendant to Quincy, and there paid over to the plaintiffs, but if W. C. T. Davidson & Co. failed to˚pay for the goods on delivery, then defendant to return said goods to the plaintiffs, at Quincy; that the defendant then made and delivered to the plaintiffs its receipt and agreement in writing, as follows: (as above set forth); and then avers, that the line of said defendant, as a common carrier, extended from Quincy to Stewartsville; that the letters "C. O. D." in the receipt mean that the defendant promised the plaintiffs to deliver the goods to W. C. T. Davidson & Co., only on payment of the price, and to deliver the price, when paid, to the plaintiffs at Quincy; and in case of non-payment of the price, to return the goods to the plaintiffs at Quincy; that although a reasonable time had elapsed, the defendant, though specially requested, had not delivered to the plaintiffs either the money or the goods or any part thereof.

The fourth count was for goods sold and delivered, money had and received, and money due on an account stated.

The plaintiffs read in evidence, without objection, the above receipt. The defendants admitted that the signature of Durfee was the genuine signature of the authorized agent of the company; and he, being examined for the plaintiffs, testified that he was the agent of the company at Quincy, at the date of the receipt, and had been ever since. He stated that the letters C. O. D. meant that the express company was to collect on delivery the amount due from the consignee and marked on the package, and return that amount to the consignors. He further stated, that plaintiffs had made inquiries about this package at the express office, and had called there for the money mentioned in the receipt, but he could not recollect when they called. They wanted the money. The box was not

returned.    The defendants then admitted Durfee's agency, and that they were common carriers as alleged.

E. M. Wood testified, that he was a clerk and traveling agent of the plaintiffs in their wholesale department, from November, 1862, to June, 1864; that he traveled in Missouri for the plaintiffs; that he selected the goods for the box in controversy, but did not pack them; the goods were worth $356.34, and the box was so marked. In the winter of 1863–4, he traveled in Missouri for the plaintiffs, in general charge of their business in that State, in making sales and collections; that plaintiffs, before bringing suit, had called on the express company for the money to be collected on the box, but could get neither the money nor the goods.

This was all the evidence in chief, for the plaintiff.

Now, to understand the first error assigned, the defendants introduced the deposition of Summers, who had been the former partner of Davidson, and express agent, as above stated, in which deposition was an interrogatory numbered four, and the answer thereto, as follows:

"Did or did not the said firm, while you were a member of it, buy goods of the plaintiffs in this suit? If yea, how often? and by what mode of conveyance were such goods received? How were the packages of boxes containing the same marked as to collection? On what terms, as to delivery and credit, were the same bought of the plaintiffs? And what was the course of dealing between your said firm and said plaintiffs, in respect to the delivery of the same, and collection of the proceeds thereof? and when did said course of dealing commence? and how long did it continue?"

"The firm of W. C. T. Davidson & Co., when I was a member of it, did buy goods of the plaintiffs in this suit, some three or four times.    The goods were conveyed to us by the American Express Company.    The packages containing the goods were marked 'C. O. D.'    We bought on thirty days' credit, and the goods were paid for in three installments, of ten days each, by remittances through the American Express Company to S. J.

Lesem & Bro. The goods were delivered to us on receipt to the American Express Company and paid for as stated, *i. e.*, in installments through express company to Lesem & Brother. This course of dealing between Lesem & Brother and us commenced in June, 1863, and continued about four months, or as long as I was a member of the firm of W. C. T. Davidson & Co."

The plaintiffs objected to this interrogatory and answer on the ground of irrelevancy, and as seeking to vary by parol the written contract, and to prove a custom variant from the contract, and to establish a course of dealing between the plaintiffs and other parties prior to the contract with the defendants.

The fifth interrogatory and answer thereto were as follows:

"What objection, if any, did Lesem and Brother make to the delivery of C. O. D. goods without payment, in the manner you have stated?"  "They made no objection whatever."

The sixth interrogatory and answer were as follows:

"Will you please state whether you, as agent of said company as aforesaid, did or did not deliver goods marked 'C. O. D.,' sent by said plaintiffs, through said express, directed to said W. C. T. Davidson & Co., at said Stewartsville, without collection? If yea, when and how often did you do so, and by whose authority or permission, if any, did you do so?"

"I did deliver goods marked 'C. O. D.' to W. C. T. Davidson & Co., without collection, some three or four times, by permission of S. J. Lesem & Co., and also by permission of E. M. Wood, their agent."

The objections to this interrogatory and answer were, in addition to those made to interrogatory four, that Wood's attention when examined as a witness, was not called to any such conversation with him.

The seventh interrogatory and answer were as follows:

"What agreement or understanding, if any, was there between your firm and Lesem and Brother, as to the delivery of C. O. D. goods, and how long did said agreement continue in force?"  "The agreement was for us to receive and sell the goods,

and remit payment in three installments of ten days each, per American Express Company, as stated before."

Interrogatory nine, and answers thereto, were as follows:

" State whether or not, after you went out of said firm of W. C. T. Davidson & Co., you had a conversation with said Wood, in which any thing was said about said firm of S. J. Lesem & Co. selling goods to said W. C. T. Davidson? If yea, state when and where said conversation was had; and what, if any thing, was said by said Wood in said conversation as to the terms on which said S. J. Lesem & Bro. were then selling goods to said Davidson?"

" I had a conversation with Mr. Wood on the cars, some time in February, 1864, and he stated that Davidson had a large lot of goods bought of Lesem & Bro. on the way then to Stewartsville, Mo., and I believe he stated the goods were sold to Mr. Davidson on the same terms on which they were sold while I was a member of the firm of Davidson & Co."

The objection made by plaintiffs to this interrogatory and answer, besides its irrelevancy, was that Wood had been examined as a witness, and his attention had not been called to any such conversation.

The objections were sustained, and exceptions taken by the defendants.

It is now insisted by appellants that this evidence fully connected the plaintiffs, the defendants, the firm of W. C. T. Davidson & Co., and Davidson individually, as the successor of that firm, with the arrangement spoken of by the witness, and with the course of dealing under it, by which not only the firm, but Davidson, were to receive from time to time, and did receive, through this company, goods purchased from the plaintiffs without payment on delivery, notwithstanding the letters C. O. D.

The partnership of Summers with Davidson continued about four months, from June, 1863, to October of that year.

McDonald, who succeeded Summers as express agent, stated in his deposition that between the first and fifteenth of January, 1864, he, as agent, received a box at Stewartsville from Lesem & Brother, directed to Davidson, weighing about 270 pounds, marked " W. C. T. Davidson & Co.," supposed to contain merchandise and marked "C. O. D." Had received the way-bill some days previously. There was to be collected on the box $356.34. When he received it Davidson requested witness to deliver it to him without paying the collection bill at that time, but promised to pay witness in a very short time afterward, stating if he could get the box he could realize the amount in a very few days, and would then pay the bill; and that he had been in the habit of receiving "C. O. D." goods from Summers in that way. He further said that Lesem & Brother had written him a letter allowing him to receive his goods from the express agents without paying on delivery, but by sending them one hundred dollars every ten days; and he read to witness a letter, purporting to be from plaintiffs, authorizing him to do so. On the next day Davidson paid witness $250, and promised to pay the balance in a very few days, as soon as he could get his goods on sale, and thereupon he delivered the box to Davidson, taking himself the responsibility for the balance; that he immediately inclosed this money to plaintiffs at Quincy by the defendants, Davidson paying the charges on it.

The appellees contend that the exclusion of this evidence was proper, for the reason, if any such custom or agreement existed, it was with Davidson & Co. when Summers was a partner, and not with Davidson alone; and that no such arrangement with Davidson alone could avail the appellants as a defense, or preclude Lesem & Brother from afterward making a special contract with appellants contrary thereto; nor could it in any way affect or modify the written contract between these parties in this suit. And they further insist that if the excluded answers had gone to the jury, they could not have affected the verdict, and for this position they rely on the testimony of McDonald, wherein he states that he delivered the box

on his own responsibility, uninfluenced by any letter or by any previous custom or arrangement.

Such is the testimony of McDonald. He states expressly, on being importuned by Davidson to deliver the box, and on his reading a letter from Lesem & Brother, he peremptorily refused to deliver it. That on the next day, on the payment by Davidson of $250, he did deliver the box, and took the responsibility on himself for the balance. As to the letter Davidson, in his deposition, stated he received from Lesem & Brother, there is strong evidence to show it to be a fabrication. The proof is quite clear that neither member of the firm could write English, and their book-keeper, Sanders, who attended to the correspondence of the firm, swears there never was such a ∙ letter as testified by Davidson, and that there could not have been without his knowledge; that they, the Lesems, never write English letters; that neither of them can write English, and that all the correspondence is done by Wood or by him, Sanders. But McDonald did not deliver the box on the faith of any agreement or letter, but on the payment, as he says, of part of the amount due, he taking the responsibility for the balance.

But, admitting there had been an understanding or agreement to release goods from the C. O. D., that did not preclude these parties from contracting not to deliver until the money was paid. The contract by the express company was in writing, and made subsequent to Summers' retiring from the firm, and on a well settled principle of law, it could not be changed in its legal import and effect by a parol agreement. We think the objections to these interrogatories and answers were properly sustained by the court.

No argument is offered by appellants upon the exclusion by the court of the ninth interrogatory and answer thereto.

It is proper here to discuss the nature and import of the letters C. O. D., as placed on the receipt and on the box by the express company. Do they amount to a contract? And, if so, what is the extent of it? What are the liabilities assumed by the company, and how can they discharge them? These are interesting questions to the whole business community, and

deserve careful and full investigation, the more especially after the effort made by this company to deprive them of any force or meaning.   The counsel treats them as an enigma not legally explainable.

We are inclined to think that, if an express company or other common carrier resort to enigmas in the conduct of their business, they shall not alone be permitted to afford the solutions. Their agent testifies that the letters mean that the express company was to collect of the consignees, on delivery, the amount due from him and marked on the package, and to return such amount to the consignors; and this is the experience of the whole business community employing such an agency.   The letters are the initials, and so understood, of the words "collect on delivery," and this undertaking, by those letters the appellants assumed, and they must be held to a strict performance thereof.   It is admitted by the appellants' counsel that such is proved by the witness Durfee to be the extent of the undertaking; and being so, he contends the proofs and allegations of the appellees do not agree.   It is true, the proof does not cover all the counts in the declaration, but it does fully establish the first count, that setting forth the contract precisely as proved by the meaning given to the letters C. O. D.   They mean, and were so understood by both parties, that the express company should transport the box to Stewartsville, Missouri, and then deliver it to the consignee, first receiving from him the amount of money marked on the box, and deliver that money to the consignor.

We are of opinion, however, that, in order to introduce parol proof in what sense characters or letters which have not acquired a legal signification are used in a particular trade or business, it is necessary, in a suit brought upon a contract embodied in such letters or characters, to aver in the declaration that they are so used; and, as this case must go back for another trial on other grounds, the plaintiff below can take leave to amend his declaration by averring the usage of express companies, or of this particular company in question, in regard to the letters or characters C. O. D.

The point made, that Durfee was not the agent of appellants, with power to make such a contract, is not tenable. He was the agent of the company, and *prima facie* clothed with all the power necessary to enable him to carry out, on his part, the business and objects of the company, and there is no proof that the company has, at any time, repudiated his acts. There is an express admission, on the record by the appellants, that he was their authorized agent, and they must be bound by his acts done in the regular course of their business.

Now as to the amount of the recovery, which brings up the question of a new trial, the motion for which was overruled.

It appears from the evidence of McDonald, that when he delivered the box of merchandise to Davidson, he, Davidson, paid him on account thereof two hundred and fifty dollars which he transmitted to appellees, and which they received. The box was of the value of three hundred and fifty-six $\frac{34}{100}$ dollars, leaving a balance unpaid of one hundred and six $\frac{34}{100}$ dollars, for which McDonald, as agent of the company, assumed the responsibility. For this two hundred and fifty dollars which appellees received, the appellants cannot, on any known principle of law or justice, be chargeable, but for the balance only of one hundred and six $\frac{34}{100}$ dollars, though Wood testified that appellees had never been paid for this box of goods, still the fact is the appellants received and paid over to them two hundred and fifty dollars on account thereof, which, we infer from the testimony, was passed by appellees to Davidson's credit on some other account to the prejudice of the appellants, and, being so, Wood might testify this box of merchandise was not paid for. Now, if this was a question between Davidson and appellees, they might perhaps claim they had a right to apply this payment, but it being a question of a different character wholly, the appellants. have a right to insist that they should be allowed this payment of two hundred and fifty dollars, as it was received by them on a specific account and which they duly paid over to the appellees. Davidson ceased to be the debtor on account of that specific box of merchandise, to the extent of this sum paid McDonald when he so paid it,

and the company were discharged of that amount when they forwarded it to the appellees, and which they received.   The verdict then, should have been for the balance only, being one hundred and six $\frac{34}{100}$ dollars, and for this error in finding the whole sum against the company, the verdict should have been set aside and a new trial awarded.   For refusing so to do, there was error, and for the error the judgment must be reversed and a new trial had.

The appellants also complain of errors in the instructions on the part of the appellees, and specify as erroneous the third, fourth and seventh.   We have considered those instructions, and perceive nothing objectionable in either of them.   As to the fourth instruction of appellants refused by the court, we think the refusal was proper, as there was no evidence of an existing agreement such as alluded to in the instruction.   ·

For the reasons given, the judgment must be reversed and the cause remanded for a new trial.

*Judgment reversed.*