# Sheffield Furnace Co. v. Hull Coal & Coke Co.

*Action for the Breach of a Contract.*

1. *Unilateral contract; when made valid.*—A contract, though void when made for the want of mutuality of obligation, becomes valid and binding, upon the performance by the promisee of that in consideration of which said contract was made.

2. *Contract of purchase and sale may become binding though unilateral when made.*—A contract of purchase and sale, conditioned upon the seller being able to have certain things done, though void when made because unilateral and imposing no enforceable obligation on the part of the seller, becomes valid and mutually binding upon the seller being able to have done the things, upon the performance of which the contract was conditioned.

3. *Same.*—Where an agreement in writing evidences a sale and purchase of a certain quantity of coke at a specified price, provided the

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

seller is able to induce coke manufacturers to build ovens and make a certain portion of the stipulated amount of coke, and provides for notice by the seller at various times mentioned as to how much of the entire quantity of coke can be supplied during certain specified periods, and recites that the conditions of sale, binding the buyer to take the coke as specified and giving the seller the option to furnish it, are entered into to enable the seller to induce the manufacturers to build sufficient ovens by promising a certain sale of their product at a fixed price, the seller obligating himself to use his best endeavor to accomplish this end,—though at the time made such agreement was unilateral, imposing no enforceable obligation on the seller and, therefore, not binding on the buyer, when the seller induces the manufacturers to build ovens sufficient in number to produce the requisite quantity of coke, the unilateral agreement is converted from a conditional and optional one into a mutually binding contract, imposing mutually enforceable obligations on the parties thereto, for the breach of which suit can be maintained.

4. *Agency.*—Where a contract of sale and purchase of a certain quantity of coke is made between a furnace company and a coke company, upon condition that the coke company is able to induce coke manufacturers to build ovens sufficient in number to produce the requisite quantity of coke, and it is provided therein that the coke company will give notice to the furnace company as to how much of the entire quantity of coke can be supplied during certain periods, it being stated in said contract that such conditions are made to enable the coke company to induce the manufacturers to build the necessary ovens, for the accomplishment of which the coke company is to use its best efforts, there is no relation of principal and agent between the two companies ; the coke company is in no sense the agent of the furnace company to purchase coke from the manufacturers for the latter company's benefit, but is the seller of the coke on its own account.

5. *Custom and usage; admissibility of evidence thereof.*—Evidence of custom and usage is not admissible to explain or extend the meaning of a written contract, unless the terms of such written contract are ambiguous and uncertain

6. *"f. o. b"; judicial knowledge.*—Courts judicially know that "f. o. b." in contracts of sale, where the property sold is to be transported, mean, "free on board" the cars at a certain place named in the contract.

7. *Same; evidence of custom and usage*—Where a contract of sale specifies the price of the article sold, "f. o. b cars" at a certain place of destination, named in the contract, parol evidence of the custom and usage as to the payment of freight on the particular article sold, which would give to the terms a different meaning or operation than would have attached had the words of which they are the initials been originally inserted in the contract, is inadmissible ; in such a contract the price stipulated is for the articles free on board the cars at the place of destination, and does not impose upon the buyer the duty of paying the freight thereon.

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

8. *Charge to the jury.*—Where, in an action against the buyer for the breach of a contract of sale of coke at a certain price per ton, "f. o. b. cars, Sheffield, Alabama," there is evidence tending to show that after making the contract the buyer agreed to pay freight on shipments as received, and thereafter paid freight for a considerable period for all coke which was delivered to it, without objection, a charge instructing the jury that "according to the written contract between the parties, the Hull Coal & Coke Company [the seller] was bound to pay the freight on the coke to Sheffield, and the defendant was not bound to pay the freight, and if the defendant, at the instance and request of the plaintiff voluntarily paid the freight up to the 1st of July 1888, [the time of the last shipment] this did not bind them to pay the freight afterwards, nor exempt the plaintiff from the obligation to pay freight," is free from error, and should be given; the question as to whether the original contract, in respect to the payment of freight, was changed by a subsequent binding agreement between the parties, being a question for the determination by the jury from the evidence.

9. *Contract of sale; reduction of freight rates.*—In a contract of sale for a stipulated price at a certain place of delivery, a provision "that it is understood that" the seller has freight rates to the point of delivery, "on which the above price is based, but if, during the time this contract is in force this rate should be advanced, then the buyer has the option to take any undelivered portion due on his contract at the advance, or of cancelling it provided the seller does not elect to stand said advance," does not entitle the buyer to the benefit of reductions of freight rates accruing after the execution of the contract, and while it was being performed.

10. *Renunciation of contract; waiver thereof.*—Where a party to a contract offers to waive a renunciation of said contract by the other party on certain conditions, but the latter refuses to accept such offer, the party renouncing can not complain if the other party does finally accept and act upon the original renunciation.

APPEAL from the Circuit Court of Colbert.

Tried before the Hon. JAMES B. HEAD.

This action was brought by the appellee corporation against the appellant corporation, to recover damages for the alleged breach of a contract, for the sale of a large quantity of coke. The contract, which is the basis of this suit, and which was set out in the complaint, is copied at length in the opinion; and the defenses which the defendant interposed by several different pleas are sufficiently stated in the opinion.

Upon the examination of Alfred H. Moses as a witness, after testifying, in reference to the furnace company paying the freight on the coke when delivered, that he did not make any objection to it when he

first heard thereof, but afterwards both in conversation with and by letter to Mr. Hull he did object to the furnace company paying the freight at the time of the delivery of the coke, he was then asked : "At any time did you admit, in any way, that it was proper for the furnace company to pay the freight?" The plaintiff objected to this question, the court sustained the objection, and the defendant excepted.

Upon the examination of Edward Doud, as a witness for the defendant, he testified that he was at the time the superintendent of blast furnaces at Sheffield, Alabama, one of which formerly belonged to the Sheffield Furnace Company ; that he had had much experience in the management of furnaces, and had, at different times, attended to the purchase of coke for them. He further testified that he did not know the custom of the Hull Coal & Coke Company as to paying freight on coke shipped, but that he knew the general usage and custom of the coke trade. The witness was then asked : "Was there any general custom in the coke trade in this section of the country [at the time the contract with the plaintiff was made], * * * * as to which party should pay freight when the contract was to deliver the coke at at a fixed price, f. o. b. cars at the point of destination?" The defendant objected to this question, upon the grounds that it was illegal, "and it calls for testimony in conflict with the instrument of writing sued on, which was not necessary or proper to interpret any of the words in said instrument, and because witness has not shown that he is competent to speak of any custom which can control the meaning or interpretation of this contract." The court overruled this objection, and the defendant duly excepted. In answer to said question the witness replied, that by such custom the buyer paid the freight, and sent the freight bills to seller for buyer's credit on the contract price,

Upon the examination of George H. Hull, in rebuttal, he testified that he had been engaged in the coal and coke business about nineteen years at Louisville, Kentucky; and had dealt in many different brands of coke, including the brand mentioned in the contract sued on. He was then asked the following question : "Did you know the custom of the coke trade existing on, or prior to August 30, 1887, [the date of the execution of the con-

tract sued on] in relation to the payment of freight when coke is sold at a fixed price f. o. b. cars at a place of destination?'' To this question he answered that he did. He was then asked, ''What was the custom of the coke trade under such conditions, and what was it in August, 1887?'' The defendant objected to this question, on the grounds specified in the objection to the question asked the witness Doud. The court overruled the objection, and to this ruling the defendant duly excepted. The witness answered, the custom is and was at that time, ''that buyers should pay freight, deduct it from the invoice, and send the freight bills to sellers of the coke for credit.'' A similar question was asked the witness W. H. Allyn, and the court overruled the same objection interposed by the defendant, and to this ruling the defendant duly excepted.

There were many objections interposed by the defendant to the introduction in evidence of the correspondence between the plaintiff and the defendant, and the defendant duly and separately excepted to the overruling of each of these objections by the court. Such other facts as are necessary to an understanding of the decision in this case are sufficiently stated in the opinion.

The defendant separately excepted to each of the following separate portions of the court's oral charge to the jury : (1.) ''The court further charges that the defendant was not entitled under said written contract, unless it was subsequently changed, to the benefit of any reduction, which might be made in the rate of freight from the ovens to Sheffield, and that unless the contract was modified by the subsequent agreement of the parties, as I shall presently explain to you, the plaintiff was entitled, under said contract, to the sum of five dollars and ten cents for each ton of coke delivered under said contract, without regard to whether the freight was afterwards at any time less than it was at the date of the contract.'' (2.) ''That the contract offered in evidence by the plaintiff, dated August 30th, 1887, is not invalid by reason of any want of mutuality in its binding effect on the several parties thereto, if according to the terms of the contract the plaintiff arranged for the supply of coke it was to deliver to defendants, when they did so arrange, they became bound by their contract to deliver the coke, as it stipulated to do, to defendant, and defen-

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

dant could have enforced the contract against the plaintiff, or have recovered damages from the plaintiff, if it had failed to observe said contract." (3.) "There are in truth so far as the right of recovery is concerned, but two questions of fact for the jury to determine. If either one of these should be determined by you according to the contention of the plaintiff, then the plaintiff would be entitled to recover in this suit; but before you could find for the defendant, you would have to determine both of these questions or issues of fact, according to the contention of the defendant. The first question is : Whose duty was it under the contract, as ascertained by you from the evidence, to pay the carrier the freight on the coke shipped from the ovens to the defendant at Sheffield, that of the plaintiff or of the defendant? The next question is : Was there, at any time after the contract was entered into, an agreement made by these parties, by which they changed the contract, so that the defendant became entitled to the benefit of any reduction in freight rates on said coke, which might be secured from the railroad company, or companies transporting the coke?" (4.) "If you find from the evidence that by the contract as read in the light of the custom or usage, if such existed, for which I have permitted evidence to be introduced before you, or by the course of dealings established by the parties, or by the agreement of the defendant, as shown by the correspondence taken in connection with the other evidence, if under all the evidence such was the agreement, and such correspondence was binding on defendant, it was the duty of the defendant to pay the freight on the coke received by it, when it was received and afterwards to have a credit on the fixed, or contract, price of five dollars and ten cents per ton, for the freight paid thereon ; then I charge you, your verdict must be for the plaintiff for some amount, whatever that amount may be under the instructions yet to be given you by the court as to the measure of damages." (5.) "If then you should find from the evidence, that is, from the contract, taken with the testimony which I have allowed to go to you, as to the custom in the coke trade, or the course of dealings between the parties, or the correspondence by letter and telegram, that it was the duty or agreement of the defendant to pay these freights on the coke, as they took the cars from the railroad company,

then they broke the contract on the 23d day of July, 1888, because then they say, by the telegram of that date, that they 'are released from the contract, and will no longer be bound by it.' This was a breach of the contract by them, if they should have paid the freight and the plaintiff was not required to proceed any further in the fulfillment of the contract, but could treat it as ended then by such breach, and if you find that such duty was on the defendant as to payment of freights, then by their statement that they would no longer be bound by the contract, the plaintiff is entitled to maintain this action and recover damages from the defendant in this suit.'' (6.) ''How will you ascertain whose duty it was to pay the freight on this coke? I charge you that the language of the contract of August 30th, 1887, is ambiguous, in relation to the payment of the freight, and uncertain in its terms as to who was to pay it, and for that reason the law says, you may have the aid of other evidence than the contract itself to explain that ambiguity, and I have permitted evidence to be given in the case as to the general custom, existing between buyers and sellers of coke on that subject, so that you may ascertain whether there was a custom in that trade, so general in its application, and so well known in that trade, that persons dealing in buying and selling coke to be shipped to the buyer, may be presumed to have contracted with reference to that custom, and if there was such a custom, of such general application, then, I charge you that the law makes that custom a part of the contract, and that when the contract is ambiguous, as in this instance, it is to be read by you, as if the custom was incorporated into the contract.'' (7.) ''If you find that such custom existed, and that it became the duty of the defendant to pay the freight, then I charge you that by refusing to do so, in the telegram of July 19th, 1888, and the telegram of July 23d, 1888, the defendant broke the contract; and that the plaintiff is entitled to recover such damages as it may show to have sustained by reason of such breach or violation of said contract by defendant.'' (8.) ''Was there any agreement, subsequent to the making of the contract, by which it was agreed between these parties, that the defendant should have the benefit of any future reductions in freight? Bear in mind, what I have already stated to you, that, if you find from the evidence,

it was the duty of the defendant to pay the freight, it would become unnecessary for you to answer this question, in order to find for the plaintiff. But if you should find that the plaintiff should have paid the freight, then in order to return a verdict for the defendant, you must also find, that there was an agreement between the parties that the defendant should have the benefit of such freight reductions." (9.) "The defendant has offered in evidence certain letters from its president, in which the statement or declaration is made, that such agreement for the reductions had been made by plaintiff, and claims that by the failure of plaintiff to deny such statement, it was an admission of the truth of such statement. Well, the law is that, if a person makes a statement to another concerning a business transaction, under such circumstances, that it is incumbent on him to deny, or he would naturally deny the truth of such statement, if it were untrue, and he does not deny it, then it may be construed into an admission by such party that the statement is true; but if preceding such statement and failing to deny it, the same statement had been made to plaintiff by the defendant, and by plaintiff denied to defendant, there would be no necessity for plaintiff to again deny a repetition of the statement, because persons are not required to deny back and forth statements as often as they may be made, when the matter is already denied and at dispute. There would be no sense in that, it would be child's play." (10.) "On the question of the amount of damages, it would be proper for you to consider, whether the agreement was made to allow the defendant the benefit of the future reductions in freight, and if you find from the evidence that such agreement was made, and you find for the plaintiff, then the amount of plaintiff's recovery would be reduced by the amount of any reductions which you may be satisfied from the evidence has been made in such freights since said agreement."

The court, at the request of the plaintiff, gave, among others, the following written charges: (1.) "If the jury believe from the evidence that it was the duty of the defendant to pay the freight, and further believe that defendant refused to pay the freight, and broke the contract, because the plaintiff would not pay said freight, then plaintiff is entitled to recover in this suit such

damages as it has sustained, even if the jury should believe that there was a verbal agreement that defendant should have the benefit of reduced rates of freight." (3.) "If the jury believe from the evidence that defendant broke the contract by a refusal to pay freight, and further believe that there was a verbal contract by which the defendant was to have the benefit of freight reduction, then the measure of plaintiff's recovery would be the difference between the contract price as shown by the written agreement and the price of coke at Sheffield at the time the contract was broken, *deducting* therefrom the amount of freight reduction from $2.85 per ton as may be *shown by the evidence.*" (4.) "If the jury further find from the evidence, that, it was the general custom in the coke trade, for the purchaser to pay freight, and that the superintendent of the defendant in this cause knew of the existence of such custom, when he executed the original contract in this cause, and that thereafter the defendant paid the freight and continued to do so for some time, then it became the duty of the defendant to pay the freight, and the defendant had no right to abandon the contract, because the plaintiff refused to make such payment; and, if the defendant abandoned said contract under these circumstances, then said contract was broken by the defendant, and your verdict should be for the plaintiff."

The defendant separately excepted to the giving of each of the charges requested by the plaintiff, and also separately excepted to the court's refusal to give the following charge, among others, requested by it: (1.) "According to the written contract between the parties, the Hull Coal & Coke Company were bound to pay the freight on the coke to Sheffield, and the defendant was not bound to pay the freight, and if the defendant, at the instance and request of the plaintiff voluntarily paid the freight up to the 1st of July, 1888, this did not bind them to pay the freight afterwards, nor exempt plaintiff from the obligation to pay freight."

There was judgment for the plaintiff, assessing its damages at $35,000. The defendant brings this appeal, and assigns as error the several rulings of the trial court to which exceptions were reserved.

Brooks & Brooks and Roulhac & Nathan, for appel-

lant.—The written instrument sued on in this action was not an absolute valid contract of sale, it was a conditional contract of sale. It did not embody the elements necessary to constitute a valid sale, which are as follows : (1) parties competent to contract; (2) mutual assent; (3) a thing, the absolute or general property in which is transferred from the seller to the buyer; and (4) a price in money paid or promised. It was a conditional sale.— *Williamson v. Berry*, 8 How. (U. S.) 544; *Wittkowsky v. Wasson*, 71 N. C. 451; *Shealy v. Edwards*, 73 Ala. 175; *Pilgreen v. State*, 71 Ala. 368; Tiedeman on Sales, § 200.

The clause in the contract "provided the Hull Coal & Coke Company are able to induce the operators to make coke for 3,700 cars of the above amount," makes the alleged contract of sale provide what the coke company shall receive for a *contemplated act*, but imposes no obligation on it to do the *act*. This results in making the contract unilateral, and therefore invalid. It is indispensable to the legal validity of a contract that it should be mutually obligatory upon both parties or it will be binding upon neither of them.—*Branch Bank v. Steele*, 10 Ala. 925; *James v. Stiggens*, 13 Ala. 835; *Evans v. C. S. & M. Railway Co.*, 78 Ala. 345; *Wilks v. Ga. Pac. R. R. Co.*, 79 Ala. 180; *Borst v. Simpson*, 90 Ala. 373, 7 So. Rep. 814; Chitty on Contracts, 3; 1 Addison on Contracts, § 18; Bishop on Contracts (Enlg. Ed.) §§ 77, 78; Benj. on Sales, § 41; *Hunt v. Wyman*, 100 Mass. 198; *Rutledge v. Grant*, 4 Bing. 653; *Humphries v. Carvalho*, 16 East. 45; *Cook v. Loxley*, 3 Book, T.R., vol.5, p. 4; *Burton v. G. N. Railway Co.*, 9 Ex. 507; *Gt. Nor. Railway Co. v. Witham*, L. R. 9 C. P. 16; *Smith v. Weaver*, 90 Ill. 392; *Campbell v. Lambert*, 36 La. Ann. 35; *Houston v. Mitchell*, 36 Tex. 85; 1 Pars. on Contracts, p. 448.

There is no question, as already stated, that if the coke company had ever, at any time before the withdrawal of the furnace company, said to or agreed with the latter that it would perform the contract, that it would exercise its option which the contract, in express terms, gave it, then a binding contract would have been effected; but that in this case, it never did, and, therefore, the element of mutuality under this contract was not thereby supplied. If the coke company had done any act in recognition of the fact that the promise to

pay by the furnace company was a consideration to it for the relinquishment of its right of election or option to furnish all or any of the coke to be furnished *in futuro* the same result would have followed as in the case of *Evans v. C. S. & M. Railway Co.*, 78 Ala. 345 ; but that would necessarily be, either in express terms or by implication, a surrender of the option by an agreement to perform the thing to which the option relates. An option accepted, expressly or impliedly, is no longer an option, but is an agreement. But so long as the option continues, is open, the party in whose favor it is reserved can not be deprived of it, and while it remains, no right of action is given against him respecting its subject matter. Hence, where there is an express option to do or not do a particular thing, the element of mutuality is not supplied, and can not be, so long as the option continues.—*Cook v. Loxley*, 3 T. R. 653 ; *Dickinson v. Dodds*, 2 Ch. Div. 463 ; *Byrne v. Van Tienhoven*, 5 C. P. D. 344 ; *Stevenson v. McLean*, 5 Q. B. D. 346 ; *Burton v. Gr. Nor. Railway Co.*, 9 Ex. 507 ; *Borst v. Simpson*, 90 Ala. 373, 7 So. Rep. 814 ; *East Line &c. R. R. Co. v. Scott*, 72 Tex. 70 ; *Chicago & Great Eastern Railway Co. v. Dane*, 43 N. Y. 242 ; *Evans v. C. S. & M. Railway Co.*, 78 Ala. 345 ; *Wilks v. Ga. Pac. R. R. Co.*, 78 Ala. 185 ; Tiedeman on Sales, § 41 ; Bishop on Contract (En. Ed.), § 78 ; *Davis v. Robert*, 89 Ala. 405, 8 So. Rep. 114 ; *Iron Age Pub. Co. v. W. U. Tel. Co.*, 83 Ala. 509, 3 So. Rep. 449 ; *Oliver v. Ala. Gold Life Ins. Co.*, 82 Ala. 425, 2 So. Rep. 445.

A promise is a good consideration for a promise ; but a promise is not a good consideration for a promise unless there is an absolute mutuality of engagement so that each party has the right at once to hold the other to a positive agreement. This rule is not controverted in this case ; but in all cases where the promise is relied on as a consideration, that promise must be concurrent or obligatory, or it is without mutualtiy. A promise must be absolute in the sense that it is obligatory on the party to be affected by it.—*Storm v. United States*, 4 Otto 76 ; *Emerson v. Slater*, 22 How. 35 ; *Evans v. C.S. & M. Railway Co.*, *supra; Ewing v. Gordon*, 49 N. H. 444 ; *Keep v. Goodrich*, 12 John. 397 ; *L'Amoreux v. Gould*, 3 Seld. 349 ; *Dresel v. Jordan*, 104 Mass. 412 ; *Jenness v. Mt. Hope Iron Co.*, 53 Me. 20, 23 ; 1 Chitty on Contract, 297 ; 1 Chitty on Pl., 325 ; 1 Pars. on Contr., 450–452 ; *Tucker v.*

*Woods*, 12 Johns. 190 ; *Eskridge v. Glover*, 5 Stew. & Por. 274 ; *Dorsey v. Packwood*, 12 How. 137 ; *Woods v. Edwards*, 19 Johns. 205 ; *Bradley v. Denton*, 3 Wis. 493 ; *Willetts v. Sun. Mut. Ins. Co.*, 45 N. Y. 45 ; *Hill v. Roderick*, 4 Watts. & S. 221 ; *Hickman v. Glazebrook*, 18 Ind. 210 ; *Railroad Co. v. Dane*, 43 N. Y. 240 ; *Sykes v. Dixon*, 9 A. & E. 693 ; *Bailey v. Austrian*, 19 Minn. 535 ; *Mathews' Admr. v. Meek*, 23 Ohio St. 272, 292 ; *Philpot v. Gruinger*, 14 Wall. 570; *Comer v. Bankhead*, 70 Ala. 144 ; *Union Ref. Co. v. Barton*, 77 Ala. 157 ; *Bank v. Steele*, 10 Ala. 926 ; *James v. Stiggins*, 13 Ala. 825 ; *Erwin & Williams v. Erwin*, 25 Ala. 236 ; *Chambliss v. Smith*, 30 Ala. 370 ; 5 Lawson's Rights, Rem.& Prac., § 2243 and note ; 3 Amer. & Eng. Encyc. of Law, p. 831, note 2.

A proposal to be made binding must be intended to affect legal relations. It must be an offer of a contract. Its terms must be sufficiently certain to enable the court to say what the agreement is.—*Recknagle v. Schmalz*, 33 N. W. Rep. (Iowa) 365 : *Adams v. Adams*, 26 Ala. 272 ; *Whelan v. Sullivan*, 102 Mass. 204 ; *Baxter v. Bishop*, 65 Iowa 582 ; *Pearce v. Watts*, 20 N. J. Eq. 472 ; *Taylor v. Portington*, 7 DeGex, M. & G. 328 ; *Roberts v. Smith*, 4 H. & N. 315 ; *Nelson v. Van Bonnhorst*, 29 Pa. St. 352 ; *Moorhouse v. Colvin*, 15 Beav. 341, 350 ; *Graham v. Graham*, 34 Pa. St. 475 ; *Thompson v. Stevens*, 71 Pa. St. 161.

The contract sued on was an executory one. The coke company has an option to deliver this coke in separate instalments. Before any instalment was delivered unquestionably it had the right not to deliver any portion of it or of any instalment. The delivery of any instalment, or the advice from it that it would deliver any quarterly instalment, was an exercise of its option to deliver for and as to that instalment; and that much of the contract became bilateral, by the advice or acceptance of the option, and executed by the delivery of any instalment. But as to any unexecuted part, so far as its agreement remains executory, it still had the same option, and was not bound under such option to make delivery of any further instalment. That much of it then remained unilateral, and all the authorities concur, that so long as it remained unilateral as to one party, the other could rescind it.—*Gt. Nor. Railway Co. v. Witham*, L. R. 9 C. P. 5 ; *Burtcy v. Gt. Nor. Railway Co.* 9 Ex. 507 ; *C. & G. E. Railway Co. v. Dane*, 43 N. Y. 240 ; *Sey-*

mour v. Davis, 2 Sandf. 239 ; Thayer v. Burchard, 99 Mass. 508 ; Keller v. Ybarru, 3 Cal. 147 ; Railroad Co. v. Mitchell, 38 Tex. 86 ; Campbell v. Lambert, 56 La. Ann. 35 ; Bailey v. Austrian, 19 Minn. 535 ; 3 Amer. & Eng. Encyc. of Law, p. 844 n. ; 1 Benj. on Sales, §§ 66, 67, pp. 87, 88 ; 2 Suth. on Dam. 357-9.

The coke company was made by the contract the agent of the furnace company. The coke company undertook, if it undertook anything, to obtain coke for the furnace company from other persons. It was to induce manufacturers of coke to provide ovens for the purpose of filling this contract. In the literal signification of the language used the manufacturers were to fill the contract; but it is wholly immaterial, so far as the relation of the coke company to the furnace company was concerned, whether or not the manufacturers of the coke were to fill it. It clearly undertook to procure the coke. It refused to bind itself to deliver it, and when it did deliver it, although it may then have occupied the position of a vendor, it can not discard the relation of agent, at the same time resting upon it, and voluntarily assumed by it in a more explicit manner than any other obligation assumed throughout the whole transaction; nor can it repudiate the duties, obligations and liabilities growing out of that relation.—Mechem on Agency, §§ 214, 295, 687, 689,932; Un. Refining Co.v. Barton, 77 Ala. 148; 1 Amer. & Eng. Encyc. of Law, 347, n. 2; Braun v. Chicago, 110 Ill. 186 ; Sibbald v. Iron Co., 83 N. Y. 378; Wylie v. Marine Nat. Bank, 61 N. Y. 415; Ireland v. Livingston, 5 Eng. & Irish App. L. R. 395 ; L. R. 5 H. L. 395; Farmers' Bank v. Logan, 74 N. Y. 577, 578; Moors v. Kidder, 106 N. Y. 32 ; Newhall v. Vargas, 13 Me. 93; Armstrong v. Elliott, 29 Mich. 485 ; Kimber v. Barber, 9 L. R. C. H. 56; Gt. Luxembourg Railway Co. v. Sir William Magnay, 25 Beav. 586.

The coke company, being the agent for the furnace company in the purchase of coke, could not buy its own property for the furnace company.—1 Story's Eq. Jur., §§ 315, 316; Conkey v. Bond, 36 N. Y. 427; Taussig v. Hart, 58 N. Y. 425; Story on Agency, § 9; Mechem on Agency, § 68; 1 Amer. & Eng. Encyc. of Law, 375; Pegram v. Railroad Co., 84 N. C. 696. And likewise was it a breach of the fiduciary relation for the coke company to act as agent for the furnace company and also as

agent for the manufacturers in making the sale.—*Adams v. Sayre*, 70 Ala. 326; Anson on Contracts, 341; *Porter v. Woodruff*, 36 N. J. Eq. 179-181; *Murray v. Beard*, 102 N. Y. 508; Mechem on Agency, §§ 462, 952; Anson on Contracts, 335-6, 343; *Robinson v. Mollett*, L. R. 7 H. L. 802; 1 Benj. on Sales, 257; *Taussig v. Hart, supra*; *Murray v. Beard, supra*; *Dutton v. Willner*, 52 N. Y. 312.

In the contract sued on in this case, the furnace company was entitled to any benefits resulting from the reduction in the rate of freight. It is plain that $5.10 was not the fixed price mentioned as such in the contract, because the coke company was to deliver the coke f. o. b. cars at Sheffield, which necessarily includes the freight and all other charges prior to an absolute delivery. If the freight advances the $5.10 price is either to go up, or all sales or deliveries are at an end. If $5.10 were the agreed price, this could not be so. Hence, it is considered that at the initial point and throughout the agreement the coke company had severed the items, separated the component parts of the consideration, which the furnace company was to furnish for the coke when delivered; one item being the value of the coke at the ovens, and the other, the freight which would have to be paid at Sheffield from the ovens to that point, which could not be fixed or agreed upon, but might be different, more or less, at different times. This is strictly conformable to the language used by the party by whom the coke was to be furnished, and which seems to have been inserted to strengthen and emphasize this feature of the arrangement. And the further declaration is made in the contract: "It is understood that the Hull Coal & Coke Company have freight rate to Sheffield, Alabama, on which the above price is based." It will not do to say, that the coke company simply considered this in making up its aggregate of $5.10 for an agreed price; because prior to that basis being employed, it had provided for a fixed price, and the only fixed price mentioned throughout the instrument was at the ovens, which could not include freight to some other point. That this provision for the "fixed price" mentioned had reference to that at the ovens and to the manufacturers, is unmistakable; and, according to the coke company's contention, that this was a sale by it, can not be disputed; because, if the agreed price, in its entirety, the $5.10 as a unit of value,

was to be paid to the operators, to whom it was to be promised as an inducement for manufacturing the coke, then there was in the contract no other function for the coke company to perform under the contract, than and except as purchasing agent for the furnace company. This denotes a purpose, if it was a sale, as now insisted for the coke company, to have the price for the coke at the ovens, and makes this price a separate factor of the consideration. Following this the coke company represents that it had a freight rate to Sheffield, and it then makes that rate a basis of the price. This is the special act in the contract of the coke company. It had the freight rate and using this as a basis, that rate was made by both an integer, a distinct entity, of the price. Unless one or the other of these items is excluded from consideration, it must follow that it was the intention of the parties that the $5.10 should represent the sum of these two distinct and separate items; and not that the $5.10 should by itself be a single term, and agreed price, without respect to either a fixed price to the operators or a certain sum as freight to the carrier. And thus severed by the act of the parties, as this contract makes the consideration, into two items or integers, we have presented the common case of a dual consideration, or one composed of two or more distinct items. Contracts of this nature have been frequently recognized and construed by the courts.—*Montgomery Gas Co. v. City Council*, 87 Ala. 251, 6 So. Rep. 113; *Evans v. C. S. & M. Railway Co.*, 78 Ala. 346; *Norris v. Harris*, 15 Cal. 226, 256; 1 Benj. on Sales, § 77, p. 95; *Hooper v. S. M. & M. R. R. Co.*, 69 Ala. 534; *Bank v. Recknagle*, 109 N. Y. 482. If this be correct, then the act of the party in basing the price upon the freight rate would go directly to the consideration, and in the event of a reduction of the freight rate, there would be a failure *pro tanto* of the consideration, a partial removal of the base on which the contract rests, of which the one whose promise was based thereon could avail itself. There can, therefore, be no question as to the right of the furnace company to claim the benefit of the reduction in the freight rate.

Under the contract in this case the furnace company was not required to pay the freight on the coke at the time of delivery. "f. o. b. cars, Sheffield, Alabama" meant that the coke was to be delivered to the furnace

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

company at Sheffield, Alabama, free of all charges. The contract contained the further stipulation, "buyer to remit on or before the 10th of each month for all shipments made during the preceding month." This gave to the buyer a credit on coke for each month's shipment, until the 10th of the succeeding month, and if the furnace company was required to pay the freight at the time of delivery, there would not be a credit for the whole amount to be paid for the coke received in one month until the 10th of the succeeding month. The credit feature of the sale on credit is certainly an essential element of it.—2 Addison on Contracts, § 584; 2 Benj. on Sales, § 1016; *Dutton v. Solomonson*, 3 Bos. & P. 582; *Brooke v. White*, 1 Bos. & P. 330; 5 Wait's Ac. & Def., p. 583; Story on Sales, § 240; Newmark on Sales, § 6, n. 19; *Anstedt v. Sutter*, 30 Ill. 164, 166. The court below sought to avoid the effect of this, by admitting testimony that the usage of the coke trade was that f. o. b. cars at the point of delivery meant that the buyer was always to pay the freight, and be credited with it, when he came to pay the seller the agreed price. This might be true, though it is not conceded under this contract, if the payment of the agreed price was to be made when the goods were delivered; but it can not be so, where there is no separation of payments made in the contracts, and when the price was to be paid at a future day. What is the rule of law on this subject? If the terms of the contract itself supply the proper construction, no extraneous evidence can be introduced to contradict it. If the usage set up is inconsistent with the terms of the contract it is not incorporated in the contract, and such usage can not prevail against the contract.—*Moran v. Prather*, 23 Wall. 492; *Thompson v. Riggs*, 5 Wall. 663; *U. S. v. Buchanan*, 8 How. 83; *Hopper v. Sage*, 112 N. Y. 530; *Barnard v Kellog*, 77 U. S. (10 Wall.) 383; *F. & M. Nat. Bank v. Logan*, 74 N. Y. 586; 2 Pars. on Contracts, 546, n.; *Smith v. Clews*, 114 N. Y. 190 and note thereto in 11 Amer. St. Rep. 632; 23 How. 49. Evidence of custom and usage may be admissible to explain what is doubtful in a written contract, but never to contradict what is plain.—*Scott v. Hartley*, 25 N. E. Rep. 826; *Cox v. Peterson*, 30 Ala. 608; *M. & E. R. R. Co. v. Kolb*, 78 Ala. 396; *Wilkinson v. Williamson*, 76 Ala. 163; *E. T., Va. & Ga. R. R. Co. v. Johnston*, 75 Ala. 596; *Robinson v. Mollett*, L. R. 7 H. L. 802; Anson on Contr., 343.

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

Did the party who was entitled to treat the contract as broken, so treat it, or did he continue to treat it as operative, and insist upon its further performance? If he acted upon the breach, if there was one, then his only duty would be to show the breach, and his right to damages would be the legal consequence. But, on the other hand, if he still insisted upon the performance of the contract by the party alleged to have broken it, he waived the breach, and can not found a right of recovery thereon. If a promisee does not accept the renunciation, and continues to insist on the performance of the promise, the contract remains in existence for the benefit and at the risk of both parties, and if anything occurs to discharge it from the other causes, the promisor may take advantage of such discharge.—*Avery v. Bowden*, 5 E. & B. 714; *Lynch v. Paris, L. & G. E. Co*, 15 S. W. Rep. 208; Bishop on Contr., § 829 ; *Gould v. Banks*, 8 Wend. 562; *Friess v. Rider*, 24 N. Y. 367 ; *Borst v. Simpson*, 90 Ala. 375, 7 So. Rep. 814; 2 Benj. on Sales, § 860.

R. C. BRICKELL, J. B. MOORE and LAWRENCE COOPER, *contra*.—No matter what view may be entertained of the first contract considered alone, there can be no doubt about the meaning of the second. The stipulations therein are absolute as to each party. The first contract is interpreted by the second, and turned into an engagement by one to deliver and by the other to receive, and then goes on to specify precisely how the delivery is to be made, "until the whole quantity shall have been delivered." This second contract, if it had not been interpreted by the parties to it in their subsequent dealings, would plainly indicate an absolute promise by the one to deliver, and by the other to receive the coke contracted for, and to that extent to have modified the first. The parties, however, who entered into this second contract put their own interpretation on this feature of it, and by their conduct and dealings for more than five months, show unmistakably, that they mutually understood and acted on the engagement as being absolute as to each. If there had thus been any doubt about the meaning, the conduct of the parties resolved it, as a reciprocal and absolute contract to receive and to deliver.—2 Wharton on Contracts, § 653 ; *Chicago v. Sheldon*, 9

Wall. 50; *Lowber v. Banys*, 2 Wall. 728; *Railroad Co. v. Trimble*, 10 Wall. 367; *Steinbach v. Stewart*, 11 Wall. 566; *Comer v. Bankhead*, 70 Ala. 141.

If it were conceded that, the first contract, was in its inception optional with the plaintiff, or wanting in mutuality, when the plaintiff accepted or exercised whatever of option was conferred, or performed that part of the contract in consideration of which the promise was made, the contract ceased to be optional, or wanting in mutuality.—*Atlee v. Bartholomew*, 5 Amer. St. 113, note; *Cherry v. Smith*, 39 Amer. Dec. 150 and note; *L'Amoreux v. Gould*, 3 Seld. 349; *White v. Baxter*, 71 N. Y. 254; *Willetts v. Sun Mutual Ins. Co.*, 45 N. Y. 45.

The evidence shows that immediately upon entering into the first contract, the plaintiff arranged for the production of the full supply of coke necessary to fill the engagement with the defendant. And after this, the second contract was made. The plaintiff having no further use for any option, therefore, made the absolute engagement shown in the second contract. Standing then in the light of the circumstances of the parties at the date of the second contract, after the plaintiff had had ovens erected and had contracted for a full supply of coke to fill the contract, we see that there can be no doubt about the stipulations in that contract.—1 Indexed Dig. U. S., S. C. Rep. 430, § 177.

Here, then, plaintiff first promised, in consideration of defendant's promise, to endeavor to have the ovens provided for filling the contract, and, second, that being accomplished, to deliver the coke in quantity and at the rate specified—the defendant promising to take the coke as stipulated. It is plain, then, that on the plaintiff's performing the first promise, and making the provision for the manufacture of the coke, there is no longer any right in the defendant to say, there is a want of consideration to it for its promise to receive the coke.—Bishop on Contracts, §§ 85, 87; *Storm v. U. S.*, 94 U. S. 83; 1 Wharton on Contr., § 524; *L'Amoreux v. Gould*, 3 Seldon, 349; *Atlee v. Bartholomew*, 5 Amer. St. Rep. 103 and note.

The second contention of counsel for appellant is based on the assumption of their first being correct, and is, that the contract being executory as to the delivery, the plaintiff had on option only and was under no obli-

gation to deliver, and that the defendant had the right to rescind the contract as to all undelivered instalments. The fallacy of this position is in its base. The contract we have seen was mutual and binding. The defendant, by the terms of its contract, gave its orders for the delivery of the whole amount of coke contracted for, in instalments at the rate of about ten cars per day until the whole quantity was delivered, and the plaintiff accepted the order and agreed to make the delivery. There was a promise for a promise, each of which was absolute. Addison on Contracts, § 18 ; *Storm v. U. S.*, 94 U. S. 83 ; Pollock's Principles of Cont., (Wald's Ed.) 160.

We do not dispute the proposition that custom or usage can not be introduced to change the plain terms of a contract. But if there is anything doubtful or ambiguous, or if the custom can have force as a term of the contract, without displacing the plain meaning of the express terms, it is permissible to interpret the contract in the light of such custom.—*Haas & Bro. v. Hudmon Bros. & Co.*, 83 Ala. 174, 3 So. Rep. 302 ; *Robinson v. U. S.*, 13 Wall. 363 ; *Smith v. Aikin*, 75 Ala. 209. We submit that the evidence falls directly within the rules under which usage may be proved. The contract is clearly ambiguous. And the usage does not necessarily conflict with the meaning of the other terms of the contract—that is the terms of the contract do not expressly or by necessary implication exclude the usage—they do not show "that the parties did not mean to be governed by it."—Clarke's Brown on Usages and Customs, §§ 41 and 46 ; *Collender v. Dinsmore*, 55 N. Y. 200 ; *Walls v. Bailey*, 49 N. Y. 464 ; 1 Smith's Lead. Cases, (8 Ed.) , 934 *et seq.* ; *Smith v. Clews*, 11 Amer. St. Rep. 627, and n. ; *Haas & Bro. v. Hudmon Bros. & Co.*, 83 Ala. 174, 3 So. Rep. 302 ; *Smith v. Aiken*, 75 Ala. 209 ; *E. T. V. & G. R. R. Co. v. Johnston*, 75 Ala. 604 ; 2 Wharton on Law of Evidence, §§ 966–7–8–9, 971–2 ; Lawson on Usages and Customs, 435.

It is undoubtedly true, as stated by counsel, that if the party will not accept the renunciation, and continues to insist on the performance of the promise, the contract remains for the benefit and at the risk of both parties, and if anything occurs to discharge it from other causes, the promisor may take advantage of such discharge. But, in the first place, no point was raised in the lower

court, or appears by assignment of error in this court, on the effect of waivers of renunciations of contracts by subsequent negotiations or otherwise. And, in the next place, we submit, that, if the party renouncing will not, and does not, accept the offer of the other party to waive the renunciation, and refuses all such offers and negotiations, the party renouncing can not complain that the other party does finally accept and act upon the original renunciation. And in such case the original renunciation would be the basis of an action, since, unless waived by the party making it, it is continuous and may be accepted at any time before it is retracted.—3 Amer. & Eng. Encyc. of Law, 904–5–6; *Howard v. Daly,* 61 N. Y. 375; *Frost v. Knight,* L. R. 7 Ex. Cases, 111; *Nilson v. Morse,* 52 Wis. 240; *Zuck v. McClure,* 98 Pa. St. 541; 2 Benj. on Sales, § 860 and notes.

McCLELLAN, J.—On August 30, 1887, the Hull Coal & Coke Company and the Sheffield Furnace Company executed the following writing: "Hull Coal & Coke Company sell to Sheffield Furnace Company, and Sheffield Furnace Company buy from Hull Coal & Coke Company 3,900 cars Flat Top Coke at $5.10 per net ton (2,000 lbs.) f. o. b. cars Sheffield, Ala., provided Hull Coal & Coke Co. are able to induce the operators to build ovens, and make coke for 3,700 cars of the above amount. Sellers agree to furnish 200 cars of the above amount between September 20th and November 1st, 1887. On October 1st sellers are to advise buyers how much of the 350 cars they can furnish during the month of November, 1887. On November 1st sellers are to advise buyers how much of the 350 cars they can furnish in the month of December, 1887. December 1st 1887 sellers are to advise buyers how much they can furnish of the 750 cars during the first three months of 1888. February 1st sellers are to advise buyers how much they can furnish of the 750 cars the second three months of 1888. May 1st sellers are to advise buyers how much they can furnish of the 750 cars during the third three months of 1888. August 1st sellers are to advise buyers how much they can furnish of the 750 cars for the last three months of 1888. Deliveries to be made as near as possible proportionately during each period.

"These conditions of sale, binding the buyers to take

the coke as specified above from September 20th, 1887, to December 31st, 1888, giving sellers option of furnishing for said time, are entered into for the purpose of enabling sellers to induce the operators to put up more ovens by promising them a certain sale of the product of these ovens at a fixed price.

"The sellers undertake in good faith to use their best endeavors in inducing manufacturers of coke to provide ovens for the purpose of filling this contract. Norfolk & Western Railroad weights at usual point of weighing for these mines to govern. Buyers to remit on or before the 10th day of each month for all shipments made during the preceding month. In case of strikes, accidents, deficient transportation, or other cause unavoidably causing stoppage or partial stoppage of the works of the manufacturer of this coke or of its shipment, or in case of strikes, accidents, or other cause unavoidably causing stoppage or partial stoppage of the works of the buyer, deliveries herein contracted for may be suspended, or partially suspended, as the case may be, or at the option of the party not in default may be immediately cancelled during the continuance of such interruption by immediate notice to that effect given to the other party. Such interruption or cancellation, however, shall not invalidate the remainder of this contract, but on removal of the cause of interruption deliveries shall be continued at the specified rate, and if the delayed deliveries shall not have been cancelled they shall be made thereafter at the regular rate commencing when the contract would otherwise have ended. It is understood that Hull Coal & Coke Company have freight rates to Sheffield, Ala., on which the above price is based, but if during the time this contract is in force this rate should be advanced, then buyers have the option of taking any undelivered portion due on this contract, at the advance, or of cancelling it, provided sellers do not elect to stand said advance."

A few days after this instrument was executed, Hull Coal & Coke Company used its "best endeavors in inducing manufacturers of coke to provide ovens for the purpose of filling this contract;" and succeeded. Said company was "able to induce" and did in fact induce operators—manufacturers of coke—to build ovens for the manufacture of 3,700 cars of coke of the kind specified

in the writing, and this coke was to be manufactured for
the company at a price agreed on between it and the
producers for the purpose on its part of filling its con-
tract with the defendant corporation. All this was ac-
complished, the operators induced to build ovens, the
ovens built in sufficient numbers and with adequate ca-
pacity and sufficient coke actually produced to comply
with the terms of the contract in respect of the initial
deliveries, before the time at which deliveries were to
commence had arrived. Not only so, but Hull Coal &
Coke Company, prior to said time, with a view to this
contract had engaged and bound itself to take from the
said operators, at a price agreed upon, the gross quan-
tity of coke necessary to fill its contract with the Shef-
field Furnace Company, and duly notified the latter com-
pany of the success of its efforts to induce operators to
build sufficient additional ovens to produce the requisite
quantity of coke. And on September 30th, 1887, the
Hull Coal & Coke Company advised the furnace com-
pany in respect of the number of cars of coke it could
furnish during the month of November following, to the
effect that owing to temporary scarcity of water in
the coke fields it would probably be impracticable to
deliver 350 cars during November, but this deficiency
the coke company proposed to, or suggested it would,
anticipate and discount by delivering more than the 200
cars required by the contract in October, asserting its be-
lief that in this way 550 cars—the gross number stipu-
lated for during the period—could be in any event deliv-
ered between October 1st and December 1st. At the
instance of the furnace company, deliveries were par-
tially suspended after about October 8th and throughout
the months of November, December and January, so
that up to January 30th, 1888, only sixty-six cars had
been delivered. On that day, the following instrument
was executed by Hull Coal & Coke Co. and the Sheffield
Furnace Company: ''This memorandum of an agree-
ment made this 30th of January in the year 1888 by and
between the Hull Coal & Coke Company of the first part,
and the Sheffield Furnace Company, of the second part,
witnesseth: That, whereas, there is a contract now in
existence between the parties hereto of date August
30th, 1887, whereby the party of the first part is to de-
liver to the party of the second part, and the party of

the second part is to take from the party of the first part 3,834 cars of Flat Top Coke (66 cars having already been delivered out of the 3,900 cars secured to the party of the second part under said contract), which contract is hereby referred to as a part hereof. And whereas the parties hereto have mutually agreed to postpone the delivery of the said remaining 3,834 cars in such manner that said belivery shall begin about the first day of May, 1888, and shall thence continue at the rate of about ten cars *per* day until the whole quantity shall have been delivered. Now in consideration of such agreement, and of the sum of one dollar cash in hand paid by the party of the first part to the party of the second part, the receipt whereof is hereby acknowledged, the said delivery is postponed accordingly."

After this writing was executed there were some further deliveries of coke, beginning about May 1st and continuing for something over two months, and until five hundred and sixteen cars (including the sixty-six cars delivered prior to the writing of January 30th, 1888, and mentioned therein) of the 3,900 cars had been delivered; but the deliveries after this second agreement were not of the full quantity originally contemplated by the parties and this deviation from the terms of the writings was had at defendant's instance, who from time to time requested the partial or total suspension of shipments, being unprepared to use or store the full qantity of coke as called for by the writings. Upon these suspensions it became necessary for the plaintiff to make other dispositions of the coke it had contracted to take from the producers for the purpose of filling the contract with the defendant, or to induce the manufacturers to lessen their out-put for the time of such suspension. During the first part of the month of July, 1888, the plaintiff had suspended shipments at defendant's request and had induced the producers to reduce their out-put so that the quantity manufactured was not more than the plaintiff could dispose of to third persons. To do this the ovens of the manufacturers had to be banked—the fires being put out—and it required several days to re-heat them sufficiently to make a good quality of coke. And as to so much of the out-put intended for this contract, as the plaintiff had diverted to third persons upon the suspension requested by defendant, it required some

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

little time to arrange with such persons for a cessation of shipments to them in order that deliveries might be resumed to the defendant. Pending this suspension in July, the plaintiff had made temporary arrangements with other parties to take a part of the coke intended for the defendant, and as to the residue so intended the production was temporarily stopped, the fires in the ovens being banked or extinguished. The defendant was fully cognizant of all these conditions, and of the arrangements plaintiff had made with third persons and with the manufacturers for the purpose of enabling it to comply with defendant's request for the suspension of deliveries then pending. This was the state of affairs when, beginning on July 19, 1888, the following correspondence was had between the parties :

"MONTGOMERY, ALA., July 19, 1888.
Hull Coal & Coke Co., Louisville, Ky.
Resume shipments of coke immediately. We make no payment until the 10th of the succeeding month either for freight or coke. Our secretary telegraphs immediate resumption of coke shipments necessary to keep in blast. Answer quick Montgomery and Sheffield when shipments will be resumed.
SHEFFIELD FURNACE Co.,
By Alfred H. Moses, Pres."

"July 19, 1888.
A. H. Moses, Montgomery, Ala. Dispatch received. Hull and Lafferty both away. Hull is in New York. Matter will be referred to Lafferty to-morrow.
[Signed] HULL COAL & COKE Co."

"July 20th, 1888.
Impossible to resume shipments immediately. It will take from one to two weeks to heat ovens sufficiently to draw good coke. If shipments can be stopped elsewhere that coke might be turned over to you. Will do best we can.                    HULL COAL & COKE Co."

"SHEFFIELD, ALA. July 21st, 1888.
Hull Coal & Coke Co., Louisville, Ky.
Have shipments of coke been resumed?
[Signed] SHEFFIELD FURNACE Co."

"LOUISVILLE, KY., July 21st, 1888.
Sheffield Furnace Co., Sheffield, Ala.
Shipments not resumed yet. We wired you, would

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

take sometime to heat up ovens which were put out when you ordered shipments discontinued.

[Signed] HULL COAL & COKE CO."

"SHEFFIELD, ALA., July 23d, 1888.
Hull Coal & Coke Co.:

Have ovens been fired? When? What steps taken to expedite resumption shipments? When will you assure resumption? Coke supply nearly exhausted. Unless assurance speedy resumption will be forced to bank or blow out. Answer.

[Signed] SHEFFIELD FURNACE CO."

"LOUISVILLE, KY., July 23, 1888.
Sheffield Furnace Co., Sheffield, Ala.

Hope to be able to resume shipments to-morrow or next day.

[Signed] HULL COAL & COKE CO."

"LOUISVILLE, KY., July 23d, 1888.·
Sheffield Furnace Co., Sheffield, Ala.

Will suspend shipments to others and instruct shipments resumed at once provided you pay freight as heretofore. Answer.

[Signed] HULL COAL & COKE CO."

"LOUISVILLE, KY., July 23d, 1888.
Sheffield Furnace Co., Sheffield,. Ala.,

Gentlemen: We wired you per the enclosed advising that we hope to be able to resume shipments tomorrow or next day. Since then have sent another dispatch per the enclosed letter, ......you, we would suspend shipments to others and instruct shipments resumed to you at once provided you pay freight as heretofore, asking you to wire answer in reply to this. We shall await your reply, and if favorable will instruct shipments resumed immediately. Will arrange with others to wait for their coke until we can get new ovens heated up. You must recognize that it is impossible to hold ten cars of coke per day subject to orders of any one so we can begin shipments of this amount immediately. When customers order shipments stopped we must either place coke elsewhere or put ovens out, and it often takes a week or ten days to get ovens hot enough to make first class coke after it has once been banked. We shall expect to re-

ceive dispatch from you tomorrow advising that you pay freight on coke as usual.

[Signed] Yours truly, HULL COAL & COKE Co.
Per H. D. Lafferty G. M."

"SHEFFIELD ALA., July 23d, 1888.
Hull Coal & Coke, Co., Louisville, Ky.

As you admit ability to ship coke immediately, but refuse unless we pay freight otherwise than is stipulated in the so called contract, you have violated the same and we are released therefrom, and will no longer be bound thereby.

[Signed] SHEFFIELD, FURNACE Co."

"SHEFFIELD, ALA., July 24, 1888.
Hull Coal & Coke Co., Louisville, Ky.

If we withdraw claim of violation by you, will you resume shipments coke immediately, and concede our right of freight reduction? Answer quick as supply near exhausted, and we must blow out or bank this evening.

[Signed] SHEFFIELD FURNACE Co."

"LOUISVILLE, KY., July 24th, 1888.
Sheffield Furnace Co., Sheffield, Ala.

Repeated your dispatch to Mr. Hull at U. S. National Bank, New York, asking him to wire direct.

[Signed] HULL COAL & COKE Co."

"SHEFFIELD, ALA., July 24th, 1888.
Hull Coal & Coke Co., Louisville, Ky.

Answer our morning telegram. Highly important as we must notify labor on next turn. Have not heard from Mr. Hull, six fifty-five o'clock.

[Signed] SHEFFIELD FURNACE Co."

"NEW YORK, July 25th, 1888.
SHEFFIELD FURNACE Co., Sheffield, Ala.:

We have made no failure and violated no contract, but are and have been ready to comply with all its terms. We claim you have refused to carry out terms of contract by stopping shipments of coke, and by refusing to continue payment of freight as heretofore, but to save you from going out of blast or from annoyances, we will consent to pay freight ourselves and continue to deliver the coke, you paying for it five dollars and ten cents per ton, the price stated in the contract, or we will consent

to modify contract and give you benefit of all the reduc-
tion we have talked of, amounting now to eighty-five
cents per ton, in consideration and with the understand-
ing that you are to make us daily shipments of iron on
sales or for storage of sufficient value to cover our daily
shipments of coke and freight. Answer care United
States National Bank, New York.
                    [Signed]    Hull Coal & Coke Co.,
                                By Geo. H. Hull, Pres't.''

                    ''Sheffield, Ala., July 25th, 1888.
Hull Coal & Coke Co., Geo. H. Hull, Pres't, Care U.
    S. National Bank, New York :
    Telegram received too late to avoid banking furnace.
We deny violation, and insist you violated so-called con-
tract. If we ratify and reinstate it, will you resume
shipments immediately prepaying freight and we paying
on 10th of succeeding month whatever the instrument
may require under its proper construction. Answer
quick, as we must consult absent parties before ratify-
ing or reinstating, and must instruct ore shippers. If
reinstated we must stand consequences if courts decide
we are not entitled to freight reductions, now ninety
cents.            [Signed]    Sheffield Furnace Co.''

                    ''New York, July 26th, 1888.
Sheffield Furnace Co., Sheffield, Ala.
    Replying to your telegram of yesterday : We stand
on our offers of yesterday. Answer whether you accept
either of them.    [Signed]    Hull Coal & Coke Co.,
                                By Geo. H. Hull, Pres't.''

                    ''Sheffield, Ala., July 26th, 1888.
Geo. H. Hull, P't. Hull Coal & Coke Co., New York.
    Answer yesterday's telegram, ore shippers demand in-
structions from us. We must instruct, or they will sell
to others, in which event we can not get ore to go into
blast before Jan'y. [Signed] Sheffield Furnace Co.''

                    ''Sheffield, Ala., July 26th, 1888.
    Dear Sir :—Not hearing from you in reply to our tel-
egram of yesterday, we have just answered you 'Answer
yesterday's telegram, ore shippers demand instructions
from us. We must instruct, or they will sell to others,

in which event we can not get ore to go into blast before January'.　Which we now confirm.

Very truly yours,

[Signed]　ALFRED H. MOSES, Pres't,

For Sheffield Furnace Co.

Geo. H. Hull, Esq., Pres't Hull Coal & Coke Co., care of U. S. Nat'l Bank, New York.''

In the foregoing correspondence are mentioned the two points of difference and contention between the parties, which had arisen between them up to the time at which, it is claimed by each, the other put an end to the contract by violating its terms, or refusing to carry it out according to its tenor and effect.　As appears from this and other parts of the voluminous correspondence that passed between the furnace company and the coke company, it was, in the first place, and this as early as the fall of 1887, soon after the commencement of deliveries under the contract, insisted by the furnace company, that by the terms of the contract the coke company was to pay all freight charges on the coke as and when delivered, and such charges were to be refunded to it, as and constituting a part of the gross price per ton which the furnace company was to pay the coke company on the 10th day of the month succeeding that of the deliveries settled for.　On the other hand, the coke company contended that the contract, as interpreted in the light of a general usage of the coke trade devolved upon the furnace company the duty of paying the freight charges to the carrier on receipt of the several shipments, and that the amounts so paid during a given month should go as a credit on a settlement for the gross price of the coke made on the 10th of the succeeding month.　Upon the furnace company's contention in this regard being first brought forward on October 12th, 1887, by its bookkeeper, at the suggestion of one Chas. D. Woodson, who was a director of the company, and who, with the company's general manager, had constituted the committee on the part of that company to make this contract with the coke company, the latter replied that, under the terms of the writing, taken in connection with said custom, it was the duty of the furnace company to pay the freight charges and have the amount thereof credited to it on the succeeding monthly settlement; and to this Woodson responded for the company on October 22 :

"Can't you stop coke until further orders? We will pay freight." And after this the furnace company continued to pay such freight charges, without further objection, until June or July, 1888, and did indeed pay such charges on every car of coke it received from the plaintiff. The other matter of dispute indicated in the correspondence copied above, and to which reference is also made in other letters, telegrams and propositions that passed between the parties, grew out of a claim on the part of the furnace company, and its denial and repudiation on the part of the coke company, that by the terms of the contract the furnace company was entitled to the benefit of all reductions in freight on coke delivered at Sheffield occurring subsequent to the date of the contract. There were several reductions, aggregating eighty-five cents per ton, and the furnace company insisted that the price of $5.10 per ton, originally agreed on, should be reduced, and was, by a just interpretation of the contract, reduced to $4.25 per ton.

The present action by Hull Coal & Coke Company against the Sheffield Furnace Company proceeds on the theory that the writings set out above, taken in connection with the facts we have stated, constituted a binding contract of sale by the plaintiff to the defendant of 3,900 car loads of coke, that the defendant wrongfully refused to accept and receive the coke it had contracted to receive, and thus violated its contract, and that this breach damnified the plaintiff in the sum of $100,000, which is the amount claimed in the complaint. There was verdict and judgment for plaintiff for $35,000.

The main defenses relied on at the trial were three. First, it is insisted that the writings executed by the parties impose no contractual obligations upon the defendant because of a want of mutuality, there being, it is said, the assumption of no enforceable obligation on the part of Hull Coal & Coke Co., and hence, it is argued, the formal assumption of obligation on the part of the furnace company is formal only, and without efficacy. Again, it is contended that the duty to pay freight was upon the coke company, and that its failure and refusal so to do was a breach of its contract which authorized the furnace company to wholly repudiate it. And it is further insisted, that the contract secured to the defendant the benefit, in the way of credit on the agreed price

per ton of the coke, of all reductions in freight rates for the carriage of the coke from the place of manufacture to Sheffield, that there were material reductions in these rates and that the coke company refused to allow the defendant the benefit thereof, thereby committing a breach of the contract, which released the defendant from all further obligation under it. These defenses will be considered in the order stated; and afterwards we will briefly advert to some minor points presented by the record.

Was the agreement evidenced by the writings unilateral, involving a mere option on the part of the coke company to deliver the specified quantity of coke to the furnace company, and for this reason, as is argued, not binding on either party? The contention that the agreement is of this class has for its basis certain provisions in the first four clauses of the writing executed August 30, 1857. Thus, in the first clause, the instrument evidences a sale by the coke company to the furnace company of 3,900 cars of coke provided the seller is able to induce operators to build ovens and make coke for 3,700 of said cars. Following this are stipulations which require the seller to advise the buyer at various dates mentioned how much coke can be supplied during certain subsequent periods, as, for instance, on "December 1st, 1887, the sellers are to advise buyers how much they can furnish of the 750 cars during the first three months of 1888." The third clause of the writing is as follows: "These conditions [those referred to above] of sale binding the buyers to take the coke as specified above from September 20th, 1887, to December 31st, 1888, [and?] giving sellers option of furnishing for said time, are entered into for the purpose of enabling the sellers to induce the operators to put up more ovens by promising them a certain sale of the product of these ovens at a fixed price." And it is further stipulated, that "the sellers undertake in good faith to use their best endeavors in inducing manufacturers of coke to provide ovens for the purpose of filling this contract."

Considering the agreement of August 30, 1887, apart from the writing of January 30, 1888, and taking hold of it immediately upon its execution, that is, before the coke company induced the erection of additional ovens sufficient in number to manufacture the requisite quantity of coke to fill the contract, it may be conceded that

the instrument was unilateral, imported no enforceable obligation on the part of the coke company, and hence was not binding on the furnace company. But that, the original status of the parties was entirely changed by what they, and especially the coke company, did under and in performance of the agreement. We understand the writing itself to mean simply this, that upon the success of the coke company's promised endeavors to induce operators to build additional ovens, and make 3,700 cars of coke for said company during the time covered by the agreement, that company became absolutely bound to supply the furnace company 3,900 cars of coke between September 20, 1887, and December 31, 1888. There is no other condition to an absolute sale mentioned anywhere in the writing. This condition and no other is stipulated in its first clause, where the sale is made contingent alone on the coke company's ability to induce operators to make the necessary coke. The second clause, which requires the coke company to advise the furnace company from time to time specified how much coke could be supplied during specified subsequent periods, is, in our opinion, only a resultant of the uncertainty as to how much could be delivered at all, and this uncertainty was referable solely to the condition in the first clause, and was removed as soon as that condition was complied with. And the necessity for the condition, the purpose for which it was incorporated and its meaning and intent are clearly shown in the third clause. The necessity for it arose from the fact that the output of the stipulated brand of coke at the date of the agreement was not sufficient to fill its terms. The coke company did not know that the operators could be induced to sufficiently increase the out-put to enable it to supply 3,900 cars to the furnace company. It was unwilling to bind itself in that regard until it had satisfactory assurances in the building of additional ovens, and in the undertaking of the operators that the available supply would be adequate. On the other hand, the obligation of the furnace company to take this quantity of coke was naturally an important factor of the inducements held out to the operators. And hence, as appears from the third clause of this writing, the sole purpose of the option to the coke company was to enable it "to induce the opera-

tors to put up more ovens by promising them a certain sale of the product of these ovens at a fixed price," and when this purpose was subserved the option ceased, and the agreement of the coke company was converted from a conditional and optional one, to supply the coke if the building of sufficient ovens could be induced, into an unconditional and absolute contract to supply the coke, the building of sufficient ovens, which was the only contingent element in the agreement, having been induced. The evidence is clear and free from conflict to the proof of the efforts of the coke company to induce the building of the additional ovens and the manufacture of the requisite coke by the operators, as was contemplated in the agreement, and of the entire success of these efforts. Thereby the condition to plaintiff's absolute obligation to sell and deliver the coke was met and removed and the unilateral agreement, not binding on either party because in terms not binding on one, was converted into a mutually obligatory contract.—1 Parsons on Contracts, 477, et seq., and notes ; Willets et al. v. Sun Mutual Ins. Co., 45 N. Y. 45 ; Atlee v. Bartholomew, 5 Am. St. 103, n. 113 ; Cherry v. Smith, 39 Am. Dec. 150, n. 152 ; White v. Baxter, 71 N. Y. 254 ; L'Amoreux v. Gould, 7 N. Y. 349.

That the parties themselves understood and treated this agreement, after this condition had been met and filled, as a mutually binding contract is manifested by the supplementary agreement of January 30th, 1888, wherein it is recited and stated, "that there is now a contract in existence between the parties hereto, of date August 30th, 1887, whereby the party of the first part is to deliver to the party of the second part, and the party of the second part is to take of the party of the first part 3,834 cars of Flat Top Coke (66 cars having already been delivered out of the 3,900 cars secured to the party of the second part under said contract), and which contract is hereby referred to as a part hereof," &c. Here is an express and direct recognition and declaration by the parties of the absolute and unconditional character imparted to the agreement of August 30, 1887, by the performance by the plaintiff of the condition therein stipulated, upon the performance of which the sale and delivery of the coke to the defendant was to cease to be optional with the coke company. And this construction put on the original agreement by the parties themselves

in express terms is emphasized by the fact that they all along, after condition performed, treated the contract as mutually and absolutely binding; and their declarations and conduct would certainly suffice to remove any doubt there could possibly be as to the absolue contractual duty of the coke company to deliver and of the furnace company to receive the quantity of coke specified in the writings.—*Comer v. Bankhead*, 70 Ala. 141.

But the writing of January 30, 1888, is more than a mere construction of the previous agreement; it is itself an undertaking, absolute in form and substance, on the part of the coke company to sell and deliver, and on the part of the furnace company to take and pay for, all of the 3,900 cars of coke mentioned in the first paper, except 66 cars which had previously been delivered. It is therein unconditionally stipulated that the deliveries contracted for in the writing of August 30 should be postponed for a certain time, and that said deliveries should again commence about the first day of May, 1888, and thence continue at the rate of about ten cars per day until the whole quantity—3,900 cars, less the 66 cars previously delivered—should be delivered. We do not hesitate to declare, upon the considerations to which we have adverted, that there was an existing and mutually obligatory contract between the parties at the time of the alleged violation of it by the defendant, in July, 1888, for the sale and delivery of the specified quantity of coke.

2. We are equally free from doubt to the conclusion that there is no question of agency between the coke company and the furnace company in this transaction. It is manifest, we think, as well upon the words of the writings, as from the situation and course of dealings between these companies, that the coke company was in no sense the agent of the furnace company to purchase coke from the operators for the latter, but was itself the seller on its own account of the coke to the furnace company. And we deem it unnecessary to further discuss this feature of the case.

3. As has been indicated, one of the prominent questions on the trial below was as to whether, under the contract, the duty of paying freight on deliveries of coke at Sheffield was upon the furnace company or the coke company; the former contending that it was not required to make any payment whatever until the 10th of the

month succeeding that in which deliveries were made; and the latter insisting that, by the terms of the contract, as read in the light of a custom of the trade, which the court allowed to be proved against defendant's objection, the furnace company was required to pay the freight charges on each car as it was received at Sheffield, and was entitled to a credit for the amounts so paid in any month on a settlement on the 10th day of the next month There are only three provisions or expressions in the writings which bear upon this matter. In the out-set the contract provides for a sale and purchase of "Flat Top Coke at $5.10 per net ton (2,000 lbs.) f. o. b. cars, Sheffield, Ala." It also contains this provision : "Buyers to remit on or before the 10th day of each month for all shipments made during the preceding month." And this recital: "It is understood that Hull Coal & Coke Co. have freight rates to Sheffield, Ala., on which the above price is based, but, if during the time this contract is in force, this rate should be advanced, then buyers have the option of taking any undelivered portion, due on this contract, at the advance, or of cancelling it, provided sellers do not elect to stand said advance." The trial court admitted evidence of a general custom in the coke trade, in line with plaintiff's contention, to the effect that under contracts like this it was upon the buyer to advance the freight, and take a credit for the aggregate of such bills paid during a month on settlement the 10th day of the succeeding month ; and upon the writings and this extrinsic evidence submitted it to the jury to determine what the contract was in this regard. The action of the court on this subject clearly and confessedly can be sustained only on the assumption that the expressed or implied terms of the contract as reduced to writing were ambiguous in respect to this matter. We think this assumption is not justified by the language the parties have set down in the writings. It was mainly if not entirely rested upon the use of the letters, "f. o. b." in the connection shown above : these were supposed to be of such doubtful meaning as to authorize and require a resort to extraneous evidence in their interpretation. We do not so understand the principle on which the court acted. These letters have long been used and have now come into such general use in contracts of sale, where the property sold is to be transported, that their

significance is a matter of common knowledge, and, hence, of judicial cognizance. It is commonly known, and therefore courts must be held to know, that these are but the initial letters of three several words, and that these words, in connections like this, are "free on board." And even were it conceded that courts do not judicially know what they stood for and mean, and evidence *aliunde* is resorted to as in this case, such evidence could go no further than to supply the missing letters of the words, of which these letters are by such evidence shown to be the initials. The necessity, in other words, to show by extrinsic evidence what the full words are is met when the completed words are put before the court, and it affords no occasion or justification for giving, by proof of custom or usage, or other extrinsic fact, a different meaning or operation to them than would have attached to them had they been originally inserted in full in the writings. Thus in a case where parol evidence was admitted to show that the letters C. O. D., (and which are not better understood than the letters f. o. b.), in a receipt given by an express company for a package to be transported by it, were the initials of the words "collect on delivery," the court held, these words being proved, it was not competent to prove by parol what the full words meant, or to change their natural significance and effect in the case by evidence of custom or usage, or of previous dealings between the parties, so as to relieve the carrier from the duty of collecting the price of the goods from, before delivering them to, the consignee.— *American Express Co. v. Lesem et al.*, 39 Ill. 312. And in another case, where the carrier, the Adams Express Co., was under a contract to carry goods from New York to Boston, the package was marked thus : "A. King, Windsor. N. S., C. O. D. $375, from Turner's Express, Boston, Mass.," and in the receipt given for the goods was contained the directions as marked on the package. The package was delivered to Turner's Express at Boston by the Adams Express Co. without collecting therefor. The consignor sued the latter company alleging a breach of the contract, and on the trial "the defendant was allowed to prove that the whole direction meant, that Turner's Express should collect of the consignee; also, what was the custom existing among express companies receiving packages with a C. O. D. from connecting lines." It was

held by the Court of Appeals that the admission of this evidence was erroneous ; that while it was competent to give parol evidence to explain the meaning of the letters C. O. D., and thus remove all ambiguity, the contract, being thus made clear, could not be varied ; that the additional words, being of familiar and ordinary and not of technical use, and having a well defined meaning, could not be explained or varied, or a different meaning given them, nor was it competent to prove a custom or usage inconsistent therewith."—*Collender v. Dinsmore*, 55 N. Y. 200.   As has been indicated, our own opinion is, that the meaning of the letters C. O. D. in express carriage contracts, and f. o. b. in contracts like that involved in the case at bar is a matter of judicial knowledge, and that parol evidence is not needed or admissible in their interpretation.—*State v. Intoxicating Liquor Co.*, 73 Me. 278 ; *U. S. Ex. Co. v. Keefer*, 59 Ind. 263 ; *Moseley's Adm'r. v. Mastin*, 37 Ala. 216.   But whether the words of which the letters are initials are filled in by drawing upon judicial knowledge or by extrinsic evidence, the effect and result are the same : the perfected words, in either case, are inserted in the writing instead of the letters, and the instrument is to be read and construed precisely as if the words had been originally embodied in it.   Applying these principles to the present case, the words "free on board" are substituted for the letters f. o. b., and we have a contract by which the coke company agrees to sell to the furnace company 3,900 cars of coke at $5.10 per net ton of 2,000 pounds free on board the cars at Sheffield, Ala.   There can be no doubt as to what these words— free on board—mean in the connection we find them here.   Their meaning in contracts of this sort is plain and well understood.   They import that the purchaser shall be free from all expense which may have attended the shipment and transportation to the point named. Had the provision related to the initial point of the transportation, the buyer would have been entitled to the shipment at that place free from all expense incident to loading the cars—all expense indeed incurred in the premises up to and including the loading of the cars. Then it would have been upon the buyer to pay the freight—the cost of transportation—to the final destination of the consignment.   The provision here having relation to the point of final delivery, it can mean noth-

ing else than that the seller is to pay all costs and charges up to that point, and that the buyer is entitled to receive the consignment free of all such costs and expenses. And, as we have seen, these plain terms of the contract can not be changed or varied in any way by evidence of a custom existing in the coke trade, according to which the purchaser is to pay freight charges. There is, therefore, no consideration referable to the use of the letters f. o. b. which inject an element of uncertainty into the contract, or afford any ground for parol evidence in explanation of them or of the words for which they stand. The other terms of the writings bearing on this point are equally free from ambiguity and equally exclusive of the construction sought to be put upon the contract by the evidence of custom which the court allowed to go to the jury. The price to be paid was $5.10 per net ton of 2,000 lbs. This was the *price of the coke*—the amount to be paid for each ton of the commodity—on cars at Sheffield, Ala. There is no more suggestion of freight charges in this provision of the contract, than there would have been had the coke been stored at Sheffield and as stored sold by the coke company to the furnace company at a specified price per net ton. In each case the cost of transporting the coke from the ovens to Sheffield would be a constituent element or factor to be considered by the seller in fixing a price to be proposed to the would be buyer, just as the price paid by the seller to the operators for the coke at the ovens, and as the value of the seller's time and services spent and rendered in buying, shipping and delivering the coke would be constituent factors, going along with freight charges and the amount of profit the seller sought to make, in the gross sum of $5.10 per ton; and there is, on the stipulations so far considered, just as much reason and no more for holding that the furnace company was required to pay in advance of the 10th of the succeeding month, or that it was doubtful whether the contract did not require the furnace company to so pay that part of the $5.10, or so much of the $5.10, as was necessary to pay the operators what they were to receive for the coke at the ovens; and so with the coke company's profit and the value of its time and services. If this needs further demonstration it is found in the recital of the contract, that "It is understood that Hull Coal &

Coke Co. have freight rates to Sheffield, Ala., on which the above price is based." And if it is to be held that the duty of thus paying freight can be imposed upon the furnace company by extrinsic evidence of custom it might with equal propriety be held that such duty in respect of every other item going to make up the aggregate price could in like manner be imposed upon that company to the most flagrant violation and complete emasculation of the provision of the contract—the only stipulation it contains on that subject—requiring payments to be made on the 10th day of each month for all shipments made during the preceding month. The payments thus required are of the price per ton of the coke—the whole price of $5.10, no more and no less ; and there is no warrant in the contract for saying that it requires the payment of this price less in each instance that part of it which is constituted of freight charges, or that it is doubtful and uncertain on the words of the writings whether another amount than this gross price was to then be paid. We are constrained, therefore, to hold that the circuit court erred in the admission of testimony as to the custom proved against defendant's objection, and in the charges given on this subject. The trial court should itself have construed the contract, and ruled that under it there was no duty resting on the furnace company to·pay freight at all, or to pay any part of the contract price until the 10th day of the month succeeding shipments.

4. Whether the contract was changed in the respect considered above by a subsequent binding agreement between the parties is a different question, which was for the determination of the jury upon the evidence and instructions of the court. There was evidence tending to show that Woodson, subsequent to the making of the contract, agreed to pay freight on shipments as received, that he represented the furnace company in this regard, and that said company thereafter paid freight for a considerable period, several months, and upon all the coke which was delivered to it, amounting to 516 cars, without further objection. But we can not know what conclusion the jury would have reached or did reach on this part of the case, nor indeed that they reached any conclusion in this regard, and hence we, of course, can not say that the errors committed by the court in respect of

the written contract were without injury to the defendant. One conclusion open to the jury in this connection was, that the defendant at plaintiff's instance voluntarily paid the freight on shipments that were received, that is the jury might have reached that conclusion ; and if such payments were made as a matter of voluntary accommodation to the plaintiff, the fact of their being so made for a time did not bind the furnace company to continue payment, nor relieve the coke company from the duty of payment. Charge 1 requested by the defendant should, therefore, have been given.

5. It is next to be considered whether by the terms of the written contract the furnace company was entitled to the benefits of reductions in freight rates occurring after the contract was executed, and while it was being performed. We will repeat here the only provision of the writings which bears upon this point: ''It is understood that Hull Coal & Coke Co. have freight rates to Sheffield, Ala., on which the above price is based ; but if during the time this contract is in force this rate should be advanced, then buyers have the option of taking any undelivered portion due on this contract at the advance, or of cancelling it, provided sellers do not elect to stand said advance.'' Without this provision there was, as we have held, an absolute liability resting on the furnace company to take and pay for 3,900 cars of coke at the rate of $5.10 per net ton. Of course the mere fact here recited that the sellers have freight rates to Sheffield, upon which this price is based, can add nothing to nor take anything from, nor in any manner change, the absolute liability of the furnace company to pay this price. And so far as the fact itself goes, not depending on the recital for its existence, the contract is now the same as if it had not contained the recital at all. But the recital of the fact, aside from its existence, was actuated by a purpose which clearly appears by what follows it. This purpose was to provide what should be the rights of the respective parties in relation to abandoning, or continuing under, the contract in the event and only in the event there should be an *advance* in the existing freight rates to which the recital referred, the provision being that in such event the furnace company should have the option of taking the then undelivered portion of the coke contracted for by paying

such advance in addition to the $5.10 per net ton, or of cancelling the contract as to such undelivered part, unless the sellers should elect "to stand said advance." And it is not conceivable how these stipulations in the writing expressly referring and confined to an *advance* in the freight rates, and without which obviously the contract required the coke company to deliver and the furnace company to take and pay for 3,900 cars of coke at $5.10 per ton whatever the freight rates were or might afterwards be, whether higher or lower than existing rates, could be converted into a provision, or afford ground for argument or inference leading to the conclusion, that in the event of a *reduction* of such rates—a matter not hinted at in the instrument—the furnace company was to have the benefit of such reduction in the price per ton agreed to be paid by it, which being denied to it, that company had the right to repudiate the contract. In all reason, it would seem most clear that, if the parties had had any such intention, they would most certainly have expressed it in the writings, and that while stipulating for certain exceptional rights in the event of an advance in the rates, they would, had any such purpose been entertained, have also stipulated for the right now asserted by the furnace company in the event of a reduction in the said rates. That they did not so stipulate is conclusive to our minds, on the familiar maxim of *expressio unius exclusio alterius*, that they never had such a purpose, and that the contract is not open to any construction which admits of the effectuation of the right now insisted on by the defendant. The contract in this particular may have been a most disadvantageous one for the defendant, but it was competent for the parties to so obligate themselves, and it is not for the court to construe their contract by reference to that consideration.

The inquiry whether there was a subsequent parol agreement between the parties by the terms of which the defendant was to have the benefit of freight reductions was properly submitted to the jury on the trial.

6. It appears from that part of the correspondence we have copied that on July 23d, 1888, the furnace company notified the coke company that it would no longer be bound by the contract, claiming that the refusal of the latter company to deliver coke, unless the former

would pay freight at times of delivery, was a violation of the agreement, and released the furnace company from all obligations under it. This position was well taken, unless the evidence satisfied the jury that the original contract, evidenced by the writings, had been efficaciously modified by a subsequent obligatory agreement on the part of the furnace company to thus pay the freight. If the jury found this to be the case, then it is manifest that this renunciation was a breach of the contract, entitling the coke company to an immediate action upon it. That company did not immediately elect to treat the renunciation as an actionable breach of the agreement, but on the following day notified the furnace company that it would continue shipments and pay freight itself provided the furnace company would pay the stipulated price, waiving its claim as to freight reductions. This offer was declined. It is now contended that the plaintiff waived defendant's renunciation, and that, of consequence, whatever conclusion the jury may have arrived at in respect of the duty to pay freight, defendant's assertion that it was released from, and notification that it would no longer be bound by the contract was not a breach of the contract, because not accepted and treated as such by the plaintiff. It is admitted for appellee that the promisee may elect to treat such a breach as inoperative, and that by so doing he keeps the contract alive for the benefit of the other party as well as his own; but it is insisted, and we think the proposition is a sound one, "that, if the party renouncing will not and does not accept the offer of the other party to waive the renunciation, and refuses all such offers and negotiations, the party renouncing can not complain that the other party does finally accept and act upon the original renunciation." The pretermission of a present acceptance of the renunciation was in effect upon a condition which was not complied with by the defendant: the plaintiff in substance said to the defendant that, if you will continue to pay $5.10 per ton for the coke, I will waive your renunciation and keep the contract alive, but I do this only on the condition named. This condition not having been met, the plaintiff's intended waiver was as non-existent as if it had never been attempted, and the right to accept the renunciation, and thus put an end to the contract was the same as if an abortive effort to avoid that

[Sheffield Furnace Co. v. Hull Coal & Coke Co.]

necessity had not been made. We are, therefore, of the opinion that, if the defendant was, by virtue of some agreement subsequent to the written contract, to pay freight charges, its refusal to proceed in the performance of the contract, unless the plaintiff would pay these charges, was a breach of the contract which was not waived by the plaintiff. For this breach the plaintiff would be entitled to recovery, even if it be conceded that defendant was entitled to freight reductions. And on the other hand, if the defendant was not entitled to such reductions, but was under no duty to pay freight, its refusal to go on with the contract, the plaintiff paying freight, unless the freight reductions were allowed to it, was in itself an actionable breach as to which there is no pretense of waiver. So that, we concur in the view, given in charge by the trial court, that plaintiff was entitled to recover on either of these breaches, if the jury found either was a breach, and that the defendant could not recover unless it should be found both that it was under no duty to pay freight, and that it was entitled to scale the contract price of $5.10 to the extent of reductions of freight rates subsequent to the execution of the contract.

Many exceptions were reserved to the rulings of the circuit court on the admission of testimony. These went for the most part to the correspondence between the parties through their respective officers and agents. The only plausible exception taken in this connection had reference to certain communications sent by one Woodson, on the theory that he was not authorized to speak for the furnace company. We think the evidence as to his relations to the company and to the matters about which he assumed to speak in the company's behalf, was sufficient to show, *prima facie*, at least, that he acted with authority, and that the evidence of what he did was properly allowed to go to the jury. The remaining exceptions to the admission of testimony are without merit, except those which are covered by what is said in the foregoing opinion.

For the errors adverted to the judgment of the circuit court must be reversed. The cause will be remanded.

Reversed and remanded.